# EXHIBIT 1

Complaint and Waiver of Service

# EXHIBIT 1

Electronically Filed
3/1/2021 11:00 AM
Steven D. Grierson
CLERK OF THE COURT

**COMPB**
JEFFREY R. ALBREGTS, ESQ.
Nevada Bar No. 0066
jalbregts@albregtslaw.com
KRISTA N. ALBREGTS, ESQ.
Nevada Bar No. 13301
kalbregts@albregtslaw.com
JEFFREY R. ALBREGTS, LLC
701 Shadow Lane, Suite 150
Las Vegas, Nevada 89106
Telephone:  (702) 483-5026
Facsimile:  (702) 485-2343
*Attorneys for Plaintiff*

CASE NO: A-21-830229-C
Department 29

### EIGHTH JUDICIAL DISTRICT COURT

### CLARK COUNTY, NEVADA

| | |
|---|---|
| REGAL I, LLC, a Nevada limited liability company, f/k/a PEBBLE COMMERCIAL CENTER, LLC; | Case No.: |
| | Dept. No.: |
| Plaintiff(s), | |
| v. | **VERIFIED COMPLAINT** |
| EASTGATE THEATRE, INC., an Oregon corporation; DOE individuals I through X; and ROE corporations and organizations I through V, inclusive, | **EXEMPT FROM ARBITRATION** **(Injunctive Relief Sought)** |
| | **N.A.R. 3(A)** |
| Defendants. | |

Plaintiff(s) REGAL I, LLC, f/k/a PEBBLE COMMERCIAL CENTER, LLC, hereby complain against Defendant EASTGATE THEATRE, INC., and allege as follows:

### GENERAL ALLEGATIONS

1.     Plaintiff REGAL I, LLC ("Regal"), is and was, at all times relevant herein, a Nevada limited liability company.

2.     Defendant EASTGATE THEATER, INC. ("Eastgate"), is and was, at all times relevant herein, an Oregon corporation.

3.     The true names and capacities, whether individual, corporate, associate, or otherwise of Defendants herein designated as Does I through X, inclusive, are not known to

Verified Complaint

1    Plaintiff(s) at this time and are therefore named herein as fictitious Defendants.  Plaintiff(s) will

2    seek leave to amend this Complaint to allege in this action the true names and capacities of Does

3    I through X when they are ascertained.

4         4.    Venue is proper in this district pursuant to NRS 13.010(1) because Clark County

5    is the place where the parties had contracted to perform an obligation and pursuant to NRS

6    13.010(2)(a), because it is where the real property the subject of the action is situated.

7         5.    On November 5, 1997, Eastgate entered into a Ground Lease with Pebble

8    Commercial Center, LLC ("Pebble") for the subject leasehold premises located at 8880 South

9    Eastern Avenue, Las Vegas, Nevada, 89123 (the "Premises"), a true and correct copy of which is

10    attached hereto as "Exhibit 1" (the "Lease").

11        6.    On February 1, 2013, the Lease was assigned to Regal in conjunction with its

12    acquisition of Pebble.

13        7.    Pursuant to the terms of the Lease, Eastgate was to pay minimum annual rent for

14    its use and occupancy of the Premises payable in advance on the first day of each calendar month

15    of the Lease Term and Renewal Terms without notice, setoff or deduction in twelve (12) equal

16    monthly installments (each, a "Monthly Rental Payment," and collectively, the "Rent").

17        8.    On or about April 1, 2020, Eastgate became delinquent in the Rent owed to Regal

18    under the Lease when it failed to make the Monthly Rental Payment then due, presumably

19    because of the Nevada Governor's moratorium issued on March 29, 2020, staying all evictions in

20    the State of Nevada.  *See* Emergency Directive 008.

21        9.    Effective July 1, 2020, Nevada lifted the moratorium on commercial evictions

22    vis-à-vis Emergency Directive 025 issued by Nevada's Governor, which allowed commercial

23    landlords to commence eviction actions again (including summary evictions) for non-payment

24    of rent.

25        10.    Similarly, effective July 1, 2020, Emergency Directive 025, also allowed

26    commercial lenders to again commence foreclosure proceedings against non-paying

27    borrowers, including Regal.

28

2

Verified Complaint

11.     Eastgate failed to make its Monthly Rental Payments during the pendency of the moratorium for the months of May and June, as well as July, when the moratorium was lifted, and still refuses to pay any monies whatsoever for Rent owed by it to Regal.

12.     In early August of 2020, Regal reached out to Eastgate regarding its Rent delinquency and continued nonpayment of Rent despite the moratorium having been lifted.

13.     In an email dated August 17, 2020, and after telephone discussions between these Parties, Eastgate requested that they enter into a "deferral/repayment" plan, for which it proposed the following terms (the "Proposal"):

- Defer all costs (Rent/CAM/Real Estate Taxes, etc.) April thru September

- Effective October 1, 2020 – pay 15% of total revenue as Gross Rent in lieu of Base Rent, CAM, and RE Taxes – for the balance of 2020

- Effective January 1, 2021 resume regular payments per the existing lease

- Beginning May 1, 2021 begin repayment of 50% of the deferred costs, over 36 months

- Extend the Lease term 1 year

(*See* "Exhibit 2" hereto.)

14.     In a good faith effort to resolve this matter amicably and to avoid eviction and legal proceedings, Regal accepted and agreed to the terms of Eastgate's Proposal by letter dated October 14, 2020 from its counsel.  (*See* "Exhibit 3" hereto.)

15.     On November 10, 2020, having received no response from Eastgate to its October 14, 2020 letter, Regal posted a Seven-Day Notice To Pay Rent Or Quit (the "Notice") at the Premises, which it also sent to Eastgate via certified mail, return receipt requested.  (A true and correct copy of the Notice, including proof of service, is attached as "Exhibit 4" hereto.)

16.     On November 12, 2020, Eastgate reached out to Regal via email, once again proposing new but different terms as follows:

- Defer all costs (Rent/CAM/Real Estate Taxes, etc.) April thru December

- Effective January 1, 2021 thru May 31, 2021 – pay the greater of $7,000 or 15% of total revenue as Gross Rent in lieu of Base Rent, CAM, and RE Taxes each month

Verified Complaint

3

- June 1, 2021 resume regular payments per the existing lease

- August 1, 2021 begin repayment of 50% of the deferred costs, over 36 months

- Extend the lease term 1 year

(*See* "Exhibit 5" hereto.)

17.    Regal responded that same day via email stating that the new terms proposed by Eastgate "go far beyond any payment arrangement that Landlord has made with any other tenant, and are unacceptable," and that "given the vast differences between this and what has been previously proposed, we intend to move forward with the notice we served and posted earlier this week and to which you responded here today." *Id.*

18.    On November 18, 2020, Eastgate filed its Summary Eviction Answer in Las Vegas Justice Court (opening the eviction matter then styled as Case No. 20E013675), in which, among other things, it requested that the court compel mediation.

19.    On December 7, 2020, Regal filed its Landlord Complaint For Summary Eviction For Nonpayment of Rent.

20.    On December 29, 2020, the Las Vegas Justice Court held a summary eviction hearing in the matter, at which Eastgate again requested to mediate the dispute.

21.    Following the arguments of both parties at the December 29, 2020 summary eviction hearing, the Las Vegas Justice Court took the matter under advisement.

22.    Despite Eastgate's repeated requests to the Las Vegas Justice Court prior to and during the December 29, 2020 summary eviction hearing that mediation be compelled in this matter, at no point prior to or following that hearing did Eastgate even once reach out to Regal to discuss possible mediation.  Instead, Eastgate uses the Covid-19 pandemic to falsely refuse payment and, indeed, it has had substantial recent capital infusions.

23.    Eastgate has failed to pay even a single penny towards Rent which now totals twelve months of arrears in Rent in the amount of $906,528.45 owed to Regal, all in bad faith.

24.    On February 16, 2020, the Las Vegas Justice Court issued its decision from the December 29, 2020 summary eviction hearing, in which it denied Regal summary eviction and

4

Verified Complaint

1   instead referred the Parties to Clark County District Court to litigate the matter in a "formal

2   eviction setting" where it advised Regal to seek possession through a writ of restitution.  (*See*

3   "Exhibit 6" hereto.)

### FIRST CLAIM FOR RELIEF
**Unlawful Detainer Pursuant to NRS 40.2512**

25.    Plaintiff(s) repeat and reallege as fully set forth herein the allegations contained in paragraphs 1 through 24 above.

26.    Eastgate took possession of the Premises on or about November 5, 1997, pursuant to the ground Lease, which is a rental agreement in writing. *See* Exhibit 1.

27.    Under the terms of the Lease, at the time Eastgate's Rent first became delinquent in April of 2020, Eastgate was to pay periodic rent in the amount of $71,048.94 per month.

28.    On November 10, 2020, Plaintiffs served Eastgate a Seven-Day Notice to Pay Rent or Quit per 40.253 (the "Notice"), both by posting conspicuously at the Premises and sending via certified mail, return receipt requested to Eastgate at the address of the Premises. *See* Exhibit 5.

29.    The time period of the Notice has long since expired, yet to date, Eastgate has failed to comply with the Notice served and, therefore, is guilty of an unlawful detainer pursuant to NRS 40.2512.

30.    By reason of Eastgate's unlawful detainer, Plaintiff(s) are entitled to a Writ of Restitution restoring possession of the Premises by temporary and permanent writ to them pursuant to NRS 40.360.

### SECOND CLAIM FOR RELIEF
**Breach of Contract**

31.    Plaintiff(s) repeat and reallege as fully set forth herein the allegations contained in paragraphs 1 through 30 above.

32.    On April 1, 2020, Eastgate became delinquent in the Rent owed to Regal under their Lease when it failed to make the Monthly Rental Payment then due in breach of the same, and has since remained delinquent in breach of their Lease in failing to make any and all subsequent Monthly Rental Payments.

Verified Complaint

33.     As a consequence of Eastgate's breach of their Lease, Plaintiff has been damaged in a sum in excess of $906,528.45.

34.     Plaintiff(s) are entitled to recover their attorney's fees and costs from Eastgate pursuant to their Lease. *See* NRS 18.010(1).

## THIRD CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing (Tortious)

35.     Plaintiff(s) repeat and reallege as fully set forth herein the allegations contained in paragraphs 1 through 34 above.

36.     Under Nevada law every contract implies a covenant of good faith and fair dealing ("Covenant").

37.     Eastgate has breached that Covenant by, among other things, not only failing to pay the Monthly Rental Payments under the Lease since April of 2020 and then remaining delinquent after the Moratorium expired, but also in refusing to honor the terms of the "deferral/repayment" plan it proposed to Regal, only to reject it after Regal accepted it.

38.     Furthermore, Eastgate feigned requesting mediation to avoid paying Rent to Regal.  In other words, Eastgate has used and is using the Covid-19 pandemic in bad faith to avoid paying Rent to Regal and/or renegotiate its Lease with it.

39.     As a consequence of Eastgate's breach of the Implied Covenant of Good Faith and Fair Dealing, Plaintiffs have been damaged in a sum in excess of $15,000, in addition to its contractual damages here.

40.     Plaintiff is entitled to recover its attorney's fees and costs from Eastgate pursuant to their Lease. *See* NRS 18.010(1).

## FOURTH CLAIM FOR RELIEF
### Injunctive Relief

41.     Plaintiff(s) repeat and reallege as fully set forth herein the allegations contained in paragraphs 1 through 40 above.

42.     Regal has no adequate remedy at law to remove Eastgate from the subject leasehold Premises, or to prevent Eastgate from continuing to "squat" on the Premises after nearly a year of failing to pay Rent under their Lease.

6

Verified Complaint

43.     Allowing Eastgate to continue to occupy the Premises without paying Rent under their Lease has caused, and will continue to cause, Regal immediate and irreparable damage, justifying the imposition of injunctive relief enjoining Eastgate from occupying the Premises any further.

44.     Plaintiff(s) have been forced to retain the services of an attorney to prosecute this matter, and are entitled to their attorneys' fees and court costs associated therewith.

## FIFTH CLAIM FOR RELIEF
### Punitive Damages

45.     Plaintiff(s) repeat and reallege as fully set forth herein the allegations contained in paragraphs 1 through 44 above.

46.     Eastgate has mendaciously used the Covid-19 pandemic to refuse paying its Rent to Regal, and which it does not dispute as due, by (a) making an offer that was accepted by Regal only to then be rejected by Eastgate as offeror; (b) feigning it would mediate this dispute with Regal including in making such representations to the Justice Court in that proceeding; and (c) pleading poverty to Regal and the Court while receiving substantial cash infusions as a matter of public record.

47.     Eastgate intentionally engaged in such conduct with malice and oppression in that it knew such conduct would cause substantial economic injury to Regal.

48.     As a consequence of Eastgate' s malicious, oppressive and mendacious conduct, Regal is entitled to recover punitive damages from Eastgate in the amount of three times of any compensatory damages awarded to it here, or a sum in excess of $15,000.

**WHEREFORE,** Plaintiff(s) Regal I, LLC, f/k/a Pebble Commercial Center, LLC, pray for judgment against Defendant Eastgate, Theatre, Inc., as follows:

1.     For restitution and possession of the Premises by temporary and permanent writ pursuant to NRS 40.360(a);

2.     For general damages in a sum in excess of $906,528.45;

3.     For punitive damages on their claims in tort;

4.     For attorney's fees plus costs of suit incurred herein; and

Verified Complaint

7

5.    For such other relief as just and proper in the premises.

Dated this 1st day of March, 2021.

JEFFREY R. ALBREGTS, LLC

_____

JEFFREY R. ALBREGTS, ESQ.
Nevada Bar No. 0066
KRISTA N. ALBREGTS, ESQ.
Nevada Bar No. 13301
*Attorneys for Plaintiff*

## VERIFICATION

Under penalties of perjury, I declare that I am an authorized representative of the Plaintiff/Landlord in this Complaint for Unlawful Detainer and know the contents of the Complaint; that the Complaint is true and correct to my knowledge; except as to those matters stated upon information and belief, and as to those matters I believe them to be true.

I declare under penalty of perjury and the laws of the State of Nevada that the foregoing is true and correct.

| 3/1/2021 | JUSTIN BLOMBERG | |
|----------|-----------------|---|
| Date | Printed Name | Signature |

Verified Complaint

# EXHIBIT "1"

# EXHIBIT "1"

# GROUND LEASE

### (Las Vegas/Pebble)

# TABLE OF CONTENTS

**PAGE**

SECTION 1.   LEASED PREMISES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

SECTION 2.   LEASE TERM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1
    2.1     Initial Term; Termination  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1
    2.2     Renewal Terms  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2

SECTION 3.   RENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
    3.1     Minimum Annual Rent  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .2
    3.2     Percentage Rent . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

SECTION 4.   NET SALES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
    4.1     Definition of "Net Sales"  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
    4.2     Statement of Net Sales  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3
    4.3     Net Lease . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4
    4.4     Late Charges . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .4

SECTION 5.   ASSIGNMENT OR SUBLETTING . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

SECTION 6.   USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .5

SECTION 7.   TAXES AND ASSESSMENTS; INSURANCE . . . . . . . . . . . . . . . . . . . .7
    7.1     Taxes and Assessments  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .7
    7.2     Insurance  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .8

SECTION 8.   UTILITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9

SECTION 9.   MAINTENANCE AND REPAIR; LIENS  . . . . . . . . . . . . . . . . . . . . . . .9
    9.1     Maintenance and Repair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .9
    9.2     Compliance with Law  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
    9.3     Construction Liens . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
        9.3.1   Tenant's Covenants  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .10
        9.3.2   Tenant's Contest of Lien  . . . . . . . . . . . . . . . . . . . . . . . . . .10
        9.3.3   Lessor's Right to Cure  . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
        9.3.4   Notice of Lien  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
        9.3.5   Notice of Non-Responsibility  . . . . . . . . . . . . . . . . . . . . . .11

SECTION 10. IMPROVEMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .11
    10.1    Construction of Improvements  . . . . . . . . . . . . . . . . . . . . . . . . .11
    10.2    Construction of Additional improvements . . . . . . . . . . . . . . . . .13
    10.3    Ownership of Improvements . . . . . . . . . . . . . . . . . . . . . . . . . . .13

RECEIVED TIME   NOV. 4.   2:22PM

10.4    Alterations ................................................ 14
10.5    Construction of New Improvements ........................... 14

SECTION 11. INDEMNIFICATION .......................................... 15

SECTION 12. DEFAULT, INSOLVENCY, LESSOR'S REMEDIES ..... ............. 16
12.1    Default .................................................. 16
12.2    Remedies on Default ...................................... 16

SECTION 13. CONDEMNATION; CASUALTY ................................... 17
13.1    Total Condemnation ....................................... 17
13.2    Partial Condemnation ..................................... 17
13.3    Condemnation Proceeds .................................... 17
13.4    Appraisal ................................................ 18
13.5    Casualty ................................................. 18

SECTION 14. NOTICES .................................................. 18

SECTION 15. WAIVER ................................................... 19

SECTION 16. LESSOR'S ACCESS .......................................... 19

SECTION 17. JOINDER IN APPLICATIONS FOR PERMITS, LICENSES, DEDICATION OF
            LAND, ETC. ............................................... 19

SECTION 18. MORTGAGE OF LEASEHOLD .................................... 20

SECTION 19. PERFORMANCE ON BEHALF OF TENANT .......................... 24

SECTION 20. ESTOPPEL STATEMENT ....................................... 25

SECTION 21. CONVEYANCE BY LESSOR AND RIGHT OF FIRST OFFER .......... 25
21.1    Conveyance By Lessor ..................................... 25
21.2    Right of First Offer ..................................... 25

SECTION 22. MISCELLANEOUS ............................................ 26
22.1    Short Form Lease ......................................... 26
22.2    Holding Over ............................................. 26
22.3    Entire Agreement ......................................... 26
22.4    Mediation ................................................ 26
22.5    Attorneys' Fees .......................................... 26
22.6    Successors ............................................... 27
22.7    Force Majeure ............................................ 27
22.8    Severability ............................................. 27

RECEIVED TIME    NOV. 4.   2:22PM

22.9    Interest on Past-Due Obligations ...................................... 27
22.10   Captions ............................................................ 27
22.11   Governing Law ...................................................... 27
22.12   No Brokers .......................................................... 28
22.13   Nondisturbance and Attornment ...................................... 28
22.14   Landlord and Tenant ................................................. 29
22.15   Authority ............................................................ 29
22.16   Exclusivity; Right of First Opportunity ............................... 29
22.17   Operation of Business ................................................ 29
22.18   CC&Rs .............................................................. 29
22.19   Title to Leased Premises .............................................. 30

Exhibits:

Exhibit A          Leased Premises
Exhibit B          Site Plan
Exhibit C          Preliminary Title Report
Exhibit D          Common Area Improvements

# GROUND LEASE
## (Las Vegas/Pebble)

This GROUND LEASE (this "Lease") is made and entered into this __5th__ day of November, 1997, by PEBBLE COMMERCIAL CENTER, LLC, a Nevada limited liability company (the "Lessor"), and EASTGATE THEATRE, INC., an Oregon corporation (the "Tenant").

## SECTION 1. LEASED PREMISES

Upon the terms and conditions herein contained, Lessor leases to Tenant, and Tenant leases from Lessor, that certain parcel of real property containing approximately eight and one-half (8.5) acres of land situated in Clark County, Nevada, as more particularly described in Exhibit A attached hereto and incorporated herein by reference and depicted on the Site Plan for the Eastern/Pebble Center (the "Site Plan") attached hereto as Exhibit B and incorporated herein by reference, together with the access rights and cross-parking privileges described below and all other rights, privileges and easements appurtenant thereto (hereinafter referred to as the "Leased Premises"). The Leased Premises include rights of ingress and egress from the Leased Premises to Eastern and Pebble Roads and over all walking and driving areas of the Eastern/Pebble Center (the "Shopping Center") created by the Grant of Reciprocal Easements and Declaration of Covenants of Eastern/Pebble Center to be approved by the parties and recorded as hereinafter provided (the "CC&Rs"); parking in general parking areas shown on the Site Plan for the Shopping Center; and the rights to install utility lines and facilities within the boundaries of the Shopping Center as reasonably necessary to serve conveniently the Leased Premises; all of such rights and privileges being for the benefit of Tenant and its employees, invitees, contractors, agents, successors and assigns, and being more particularly delineated in the CC&RS, to which reference is here made for all purposes.

## SECTION 2. LEASE TERM

### 2.1   Initial Term; Termination

This Lease is effective as of the date first written above. The term of this Lease (hereinafter referred to as the "Lease Term") shall be for a period of twenty-five (25) years commencing on the Commencement Date, unless sooner terminated pursuant to any provision hereof, or unless extended as hereinafter set forth. Notwithstanding the above, if the Commencement Date occurs on a date other than the first day of a calendar month, then rent for the partial month shall be the Minimum Annual Rent pro-rated by day for such partial month and the Lease Term shall commence on the first day of the next succeeding month. The obligation of Tenant to pay rent shall commence on the date that is the earlier to occur of (i) ~~180~~ days after the issuance of a building permit to Tenant to construct the Improvements (as defined in Section 10.1.1 below) and Lessor's delivery to Tenant of the building pad for the Leased Premises rough graded and compacted such that the same is ready for construction of the Improvements, or (ii) the date upon which Tenant opens its theater on the Leased Premises for business (the

*270*

*(illegible handwriting)*

*July 6/99*

G:\USER\MEW\8628-91\ACT3.003
November 4, 1997

*June 12/99 (?)* 1

"Commencement Date"). Tenant immediately, diligently and aggressively shall pursue acquisition of required building permits for the Improvements. In the event that Tenant is unable to obtain a building permit from Clark County to construct the Improvements on or before the first anniversary of the date hereof, then either Lessor or Tenant may terminate this Lease an no further obligations shall accrue hereunder.

### 2.2    Renewal Terms

If Tenant is not then in default, Tenant shall have this option to renew this Lease for four (4) additional terms (the "Renewal Terms") of five (5) years each on the same terms and conditions set forth herein. If Tenant does not provide Lessor with notice of Tenant's election not to renew for a renewal term at least twelve (12) months prior to the expiration of the current term, then Tenant shall be deemed to have exercised the renewal option in question.

## SECTION 3.   RENT

### 3.1    Minimum Annual Rent

Beginning with the Commencement Date and during the balance of the Lease Term and Renewal Terms (if applicable), Tenant agrees to pay the Minimum Annual Rent for its use and Occupancy of the Leased Premises. Minimum Annual Rent shall be payable in advance on the first day of each calendar month of the Lease Term and Renewal Terms without notice, setoff or deduction in twelve (12) equal monthly installments. If the Lease Term begins (or ends) on other than the first (or last) day of a calendar month, the Minimum Annual Rent for the partial month shall be prorated on a daily basis, based on a 30-day month. Following is a schedule of the Minimum Annual Rent payable during the Term and Renewal Terms (as used herein, the term "Lease Year" shall mean the twelve (12) month period commencing on the Commencement Date and each anniversary of the Commencement Date occurring during the Lease Term and Renewal Terms; however, if the Commencement Date does not fall on the first day of the calendar month, then, for purposes of this definition of "Lease Year," the Commencement Date shall be deemed to be the date that is the first day of the calendar month following the month in which the Commencement Date occurs):

| Lease Years | Minimum Annual Rent | | |
|---|---|---|---|
| 1 through 5 | $500,000 | 6/25/99 to | 6/30/04 |
| 6 through 10 | $500,000 | 7/1/04 to | 6/30/09 |
| 11 through 15 | $600,000 | 7/1/09 to | 6/30/14 |
| 16 through 20 | $650,000 | 7/1/14 to | 6/30/19 |
| 21 through 25 | $700,000 | 7/1/19 to | 6/30/24 |
| 26 through 30 | $750,000 | 7/1/24 to | 6/30/29 |

| 31 through 35 | $800,000 |
| 36 through 40 | $850,000 |
| 41 through 45 | $900,000 |

### 3.2 Percentage Rent

In addition to the Minimum Annual Rent and other sums required to be paid by Tenant under this Lease, Tenant shall pay as "Percentage Rent" a sum equal to five percent (5%) of the amount of Net Sales (as defined below) of Tenant made from or upon the Leased Premises during each Lease Year, less the amount of Minimum Annual Rent paid by Tenant during such Lease Year. Percentage Rent shall be computed and paid annually. On or before sixty (60) days after the close of each Lease Year, Tenant shall pay to Lessor the amount by which the sum computed as five percent (5%) of Tenant's Net Sales during the previous Lease Year exceeds the Minimum Annual Rent paid by Tenant during that period. The obligations of Tenant hereunder shall survive the expiration of the Lease Term.

## SECTION 4. NET SALES

### 4.1 Definition of "Net Sales"

The term "Net Sales", as used herein, shall mean the aggregate sum paid to Tenant for (i) all merchandise and concessions, exclusive of any applicable sales taxes, admission taxes and excise taxes, sold in, upon or from the Leased Premises by Tenant, its permitted subtenants, licensees and concessionaires; (ii) the amount charged for rental of the theatre auditoriums; (iii) the amount received by Tenant as commissions for any games, amusement devices, or telephones in the Leased Premises; and (iv) the box office receipts (as defined by the film distributors) for admission to and attendance at motion picture exhibitions upon the Leased Premises, net of any applicable sales taxes, excise taxes, gross receipts taxes or admissions taxes, or any other tax imposed and actually paid by Tenant to a governmental agency other than real estate and income taxes. Credit card charges paid by Tenant to issuers of credit cards shall be deducted from Net Sales. All sales of Tenant originating at the Leased Premises shall be included in Net Sales even though the account therefor may be transferred to another place for collection or the actual filling of the order may be from a place other than the Leased Premises. Tenant will accept prepaid group sales tickets and gift certificates at the theater in lieu of cash, which are treated as cash sales within the above definition of "Net Sales", irrespective of where such tickets or certificates may have been sold. Tenant may sell gift certificates or prepaid group sales tickets from the theater, which will not be included in "Net Sales" except when redeemed at the theater.

### 4.2 Statement of Net Sales

Tenant shall furnish Lessor with an accurate statement of Tenant's Net Sales within 30 days after the close of each calendar month, and an annual statement of Net Sales (which shall

SENT BY:LSGU 1/6R FLOOR          - 4-97 : 2:34PM :          LIONEL S    91-4          605-160 200019 6

include a monthly breakdown of Net Sales) within 60 days after the close of each Lease Year. Such statements shall be signed and certified as accurate by an officer of Tenant.

Tenant shall keep full and accurate books of account, records and other pertinent data of the gross sales, Net Sales, credits, refunds and other pertinent business transactions made from or upon or otherwise relating to the Leased Premises. Such books and records shall be kept for not less than 2 years after the close of each Lease Year to which they relate and shall be available for inspection and audit by Lessor and its representatives at all times during regular business hours. Lessor's receipt of any statement of Net Sales or Tenant's payment of Percentage Rent for any period shall not bind Lessor as to the correctness of the statement or amount of the payment. Within 2 years after the receipt of any such statement, Lessor or its designated certified public accountant shall be entitled to audit Tenant's gross sales and Net Sales following 48 hours advance written notice to Tenant. Such audit shall be conducted at Lessor's initial expense during normal business hours at Tenant's principal place of business. If such audit determines that there has been a deficiency in the payment of Percentage Rent, then such deficiency shall become immediately due and payable with interest at a per annum rate equal to the greater of (i) twelve percent (12%) or (ii) the prime rate of Bank of America plus two percent (2%), calculated from the date said payment should have been made. In addition, if an annual statement of Tenant is found to have understated Net Sales by more than two percent (2%) and if Lessor is entitled to any additional Percentage Rent as a result of such understatement, then Tenant shall pay the cost of such audit. Any information obtained from such statements, audits or inspections shall be treated by Lessor as confidential and shall not be disclosed except to carry out the purposes of this Lease, but Lessor may divulge the contents of any such statements in connection with any financing arrangements involving, or assignment of Lessor's interest in, the Leased Premises or this Lease, or in connection with any administrative or judicial proceedings in which Lessor is involved and in which such information is in issue.

**4.3    Net Lease**

Except as provided to the contrary in this Lease, this Lease is a net lease and, as between Lessor and Tenant, it is intended that Tenant shall pay all costs and expenses of every character, whether foreseen or unforeseen, ordinary or extraordinary, in connection with the Leased Premises, whether with respect to the use, possession, control, operation, maintenance, repair (structural or nonstructural) or reconstruction of the Leased Premises or any improvements thereon.

**4.4    Late Charges**

Tenant acknowledges that its late payment of any monthly installment of Minimum Annual Rent will cause Lessor to incur certain costs and expenses not contemplated under this Lease, the exact amount of which is extremely difficult or impractical to fix. Such costs and expenses will include, without limitation, loss of use of money, administrative and collection costs, and processing and accounting expenses. Therefore, if any installment of Minimum Annual Rent or any other sum due from Tenant hereunder is not received by Lessor from Tenant

within ten (10) days of written notice from Lessor that it is past due, Tenant shall immediately pay to Lessor a late charge equal to 10% of the amount due plus the amount due. Such late charge is in addition to any interest due under this Lease. Lessor and Tenant agree that this late charge represents a reasonable estimate of costs and expenses incurred by Lessor from, and is fair compensation to Lessor for its loss suffered by, such nonpayment by Tenant..

## SECTION 5.  ASSIGNMENT OR SUBLETTING

Tenant shall have no right to assign or sublet the entirety or any portion of the Leased Premises without first obtaining the prior written approval of Lessor, which approval shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, Tenant may assign or sublet this Lease to any entity owned by, controlled by or under common control with Tenant, or to any entity that purchases Tenant's entire theatre business in the Clark County, Nevada metropolitan area (unless such purchase arises out of or in connection with a proceeding brought by or against Tenant, as debtor, under the Code (defined below)).

Lessor may withhold consent to a proposed transfer if, in Lessor's reasonable business judgment, any of the following is the case: (i) the proposed transferee lacks a good business reputation or sufficient business experience in operating cinemas; (ii) the financial worth of the proposed transferee as of the date of the notice is inadequate to cover the responsibilities of Tenant hereunder; or (iii) the proposed transferee's proposed use of the Leased Premises conflicts with Section 6 below.

Any purported assignment made in violation of the provisions of this Section 5 shall pass no interest hereunder to the assignee and shall be null and void and of no force and effect.  Any assignee or sublessee shall agree in writing to perform and observe, from and after the effective date of such assignment or sublease, all of the terms, covenants, conditions and provisions of this Lease to be observed and performed by Tenant and to be bound by all the provisions of this Lease.  No such assignment or sublease shall release Tenant from any of its obligations or liabilities of any nature whatsoever arising under this Lease until three (3) years after the date of a valid assignment (no such release to be given at any time for a sublease), except if the assignment is in conjunction with a sale of Tenant's entire theatre business in the Clark County, Nevada metropolitan area (unless such sale arises out of or in connection with a proceeding under the Code by Tenant), in which event such release shall occur upon such assignment.  The release of Tenant from liability upon expiration of the 3-year period described above shall be self-executing and shall not require any action from Lessor or Tenant to take effect.

## SECTION 6.  USE

The Leased Premises may be used by Tenant for the following purposes, provided, however, that (i) such permitted uses shall not include operation of a live nudity establishment, (ii) the Leased Premises shall be operated consistent with Tenant's cinemas in other regions, and (iii) the principal use shall be the use set forth in subsection (a):

RECEIVED TIME   NOV. 4.   2:22PM

(a)  As a motion picture theatre;

(b)  For other types of entertainment within the Leased Premises that occur simultaneously with but do not interfere with the presentation of motion pictures;

(c)  During the hours it is not being used as a motion picture theatre, as a public auditorium for use by the performing arts, television and radio telecasts, the presentation of special motion picture exhibitions, and meetings, lectures and presentations of educational, civic, charitable and other groups or entities of a non-political and nonreligious nature, with Lessor's prior written consent, which consent shall not be unreasonably withheld;

(d)  For the incidental retail sale of food, beverages and refreshments customarily sold in a movie theatre for consumption on the Leased Premises;

(e)  For the incidental sale of records, videos, books, magazines, toys and novelties sold in connection with any particular presentation; and

(f)  For the operation of not more than ten (10) video games and amusements in theatre lobbies during theatre hours, excluding gaming devices (i.e., no gaming devices may be used).

Tenant shall not use the Leased Premises for any other purpose or purposes without Lessor's prior written consent, which consent shall not be unreasonably withheld or delayed. Lessor may withhold consent to a proposed change of use if in Lessor's reasonable business judgment (i) the proposed use is incompatible with the tenant mix or character of the Shopping Center; (ii) the proposed use might breach any covenant of Lessor respecting radius restrictions, use or exclusivity rights in any other lease, the CC&RS, or any financing or other agreement; or (iii) the annual Percentage Rate Lessor reasonably anticipates receiving from the proposed use is significantly less than the annual Percentage Rent Lessor could reasonably anticipate receiving from the then existing use.

Furthermore, Tenant shall not use the Leased Premises in violation of any applicable law or permit affecting the Leased Premises, in an offensive manner or in a manner which would constitute a public or private nuisance or waste, or in violation of the CC&RS.

## SECTION 7. TAXES AND ASSESSMENTS; INSURANCE

### 7.1    Taxes and Assessments

Tenant shall pay, before delinquency, all taxes, assessments and other public charges levied or presently existing upon or now or hereafter assessed against the Leased Premises during the term of this Lease or any renewal thereof, including those arising by reason of the occupancy, use or possession of the Leased Premises by Tenant, all of which are hereinafter collectively referred to as "taxes." Lessor represents and warrants that there are no property taxes, special assessments or liens (other than the lien for current ad valorem taxes not yet due and payable) against the Leased Premises except as shown on the preliminary title report attached hereto as Exhibit C, and that Lessor has no knowledge of any planned or impending special assessments against the Leased Premises. Tenant shall furnish to Lessor for inspection, within ten (10) days after written request, official receipts of the appropriate taxing authority or other proof satisfactory to Lessor evidencing payment of taxes. Taxes for the years in which this Lease commences or terminates shall be prorated based upon the portion of the tax year during which this Lease was in effect. In the event Tenant shall desire to contest in good faith any assessment or tax, Tenant, at its sole cost and expense, may file in the name of Lessor all such protests or other instruments and institute and prosecute proceedings for the purpose of such contest, without cost to Lessor. Tenant shall, if required by Lessor, furnish to Lessor adequate security, as reasonably acceptable to Lessor, or a bond of a responsible corporate surety in such amount against any loss by reason of such contest.

Tenant acknowledges that Lessor may create a separate tax parcel consisting of the Leased Premises and arrange for tax statements to be billed directly to Tenant and, in that event, Tenant shall pay the taxes it is obligated to pay hereunder directly to the taxing authorities. If the Leased Premises are not separately assessed and are included in a larger tax parcel (the "Tax Parcel"), then Tenant shall pay its proportionate share of the taxes applicable to the land included in the Tax Parcel (based on the ratio that the square footage of the Leased Premises bears to the total square footage of the Tax Parcel) and its proportionate share of the taxes applicable to the improvements situated on the Tax Parcel (based on the ratio that the floor area [excluding mezzanine areas not open to the public] of the Improvements bears to the floor area of all improvements situated on the Tax Parcel).

Tenant shall promptly pay all installments of any special assessments or assessment bond payments which may become due with respect to the development, use or operation of the Leased Premises by Tenant during the Lease Term. All such payments shall be prorated for any partial year or other payment period.

Tenant shall pay its proportionate share of maintenance assessments due under the CC&Rs with respect to maintenance and repair of common driveways and walkways in the Shopping Center (based on the ratio that the land area in the Leased Premises bears to the total land area in the Shopping Center). Tenant acknowledges that Lessor, as the ultimate fee owner of the Leased Premises, is obligated to pay a proportionate share of maintenance assessments

pursuant to the CC&Rs with respect to maintenance and repair of common driveways, walkways, and other common areas within the Shopping Center. Tenant shall reimburse Lessor for the costs applicable to the Leased Premises within ten (10) days of Tenant's receipt of an invoice for such costs. Such invoice may be sent directly to Tenant by Lessor or the Managing Party (as that term is defined in the CC&Rs).

### 7.2     Insurance

7.2.1    Tenant, at all times during the Lease Term, at its sole cost and expense, shall keep or cause to be kept the Leased Premises insured against claims for personal injury or property damage under a policy of general public liability insurance, by naming Lessor as an additional insured under insurance policies maintained by Tenant in respect of the Leased Premises and the operations conducted thereon or therein. Such policies shall provide insurance in amounts and against risks (including, without limitation, comprehensive general liability) customarily and prudently insured against by companies of established reputation operating similar properties.

7.2.2    Tenant, at all times during the Lease Term, at its sole cost and expense, shall keep or cause to be kept the Leased Premises insured against fire and other risks covered by a standard fire insurance policy with an endorsement for extended coverage covering the Leased Premises, the Improvements, and any permitted alterations, additions or replacement improvements and trade fixtures, merchandise and personal property from time to time situated in, on or upon the Leased Premises. Such insurance shall cover the replacement cost of the foregoing from time to time during the Lease Term with reasonable deductibles ' and shall provide protection against any peril included within the classification of fire, extended coverage, sprinkler leakage, vandalism, theft, malicious mischief and special extended perils (all risk). Any policy proceeds shall be used for the repair or replacement of the property damaged or destroyed unless this Lease is terminated under Section 13 below.

7.2.3    Any insurance carried in accordance with this Section 7.2 shall be endorsed to provide:

(i)      Lessor shall be included as an additional insured as its interests appear.

(ii)     The interests of Lessor shall not be invalidated by any action or inaction of the named insureds or any other person.

(iii)    The insurer thereunder waives all rights of subrogation against Tenant and Lessor.

(iv)     Such insurance shall be primary without right of contribution of any other insurance carried by or on behalf of the insureds.

(v)　No cancellation of such insurance for any reason whatsoever including nonpayment of premium and no substantial change in its coverage that affects the interest of the insureds shall be effective as to the insureds, until the 30th day after they shall have received written notice from such insurer of such cancellation or change.

(vi)　Such policy shall protect each insured thereunder in the same manner as though a separate policy had been issued to each, but nothing in such policy shall operate to increase the insurer's liability under such policy beyond the limits of liability set forth therein.

(vii)　Each underwriter issuing a policy hereunder shall be acceptable to Lessor in Lessor's reasonable judgment.

7.2.4　If Tenant shall fail to maintain any insurance required by this Section 7.2, Lessor may (but need not) obtain, after reasonable notice to Tenant or without notice if no coverage is in place, such insurance and Tenant shall reimburse Lessor upon demand for its cost. The insurance to be maintained by Tenant hereunder may be carried under a blanket policy covering other properties and the Leased Premises.

7.2.5　Tenant shall upon request furnish Lessor with certificates of insurance or copies of policies of required insurance. On request, Tenant shall deliver to Lessor a report signed by Tenant's independent insurance broker stating the opinion of such firm that the insurance then carried and maintained complies with the requirements of this Section 7.

## SECTION 8.　UTILITIES

Tenant shall pay for all water, sewer, gas, heat, light, power, telephone and other utilities and services supplied to the Leased Premises, together with any taxes thereon, before delinquency.

## SECTION 9.　MAINTENANCE AND REPAIR; LIENS

### 9.1　Maintenance and Repair

Tenant, at its sole cost and expense, shall keep and maintain the Improvements in a first class manner and in a good and sanitary order, condition and repair, and, at the expiration of the Lease Term, shall deliver the Leased Premises and all Improvements to Lessor in good and sanitary order, condition and repair, subject to reasonable wear and tear from the anticipated use and casualty damage not required to be repaired or replaced by Tenant pursuant to Section 13. Lessor shall not be required or obligated to do any maintenance or to make any repairs, changes, alterations, additions, improvements, or replacements of any nature whatsoever in, on, or about the Leased Premises or the equipment, machinery, or other improvements thereon, or any part thereof. Lessor shall be responsible for maintaining and operating the common areas of the Shopping Center in a manner consistent with a first class shopping center.

### 9.2    Compliance with Law

Tenant, at its sole cost and expense, shall faithfully observe and comply with the CC&Rs and all valid requirements of all municipal, state and Federal authorities now in force, or which may hereafter be in force, pertaining to the use of the Leased Premises by Tenant. Without limiting the generality of the foregoing, Tenant shall comply with all laws applicable to the Leased Premises designed to protect the environment or human health ("Environmental Laws") and shall hold Lessor harmless from all claims, damages, costs and expenses arising by reason of any breach of Environmental Laws by Tenant or its agents and employees. Tenant may contest in good faith the validity or enforceability of any governmental laws or requirements at its sole cost and expense, provided that Tenant shall, if required by Lessor, furnish to Lessor reasonable indemnity against any loss by reason of such contest. Lessor warrants and represents to Tenant that the CC&Rs will not prohibit the operation of a cinema complex on the Leased Premises and that Lessor shall use its reasonable best efforts to cause the Leased Premises to be zoned by governmental authorities to permit operation of a cinema complex thereon.

### 9.3    Construction Liens

#### 9.3.1    Tenant's Covenants

Tenant shall pay all costs for work done by or for the Leased Premises, and Tenant shall keep the Leased Premises, Shopping Center and Improvements free of all mechanics' liens and other liens on account of work done for Tenant. Tenant shall indemnify, defend and hold Lessor harmless from and against any and all liability, loss, damage, costs, attorneys' fees and all other expenses on account of claims of lien of laborers or materialmen or others for work performed or materials or supplies furnished to or for Tenant or persons claiming under Tenant. In addition, Tenant shall keep Tenant's leasehold interest and all of the Improvements to the Leased Premises free of all attachment or judgment liens. Whenever and as often as any mechanic's or materialmen's lien is filed against the Leased Premises or the Shopping Center, or any part thereof, purporting to be for or on account of any labor or materials or service furnished in connection with any work in, on or about the Leased Premises done by, for, or under the authority of Tenant or anyone claiming by, through or under Tenant, Tenant shall promptly procure and record satisfaction and release of such lien.

#### 9.3.2    Tenant's Contest of Lien

If Tenant desires to contest any claim of lien arising from work done by or for Tenant in the Leased Premises, Tenant shall first furnish Lessor adequate security in the amount of the claim, plus estimated costs and interest, or a bond of a responsible corporate surety in such amount, conditioned on the discharge of the lien. If a final judgment establishing the validity or existence of any such lien for any amount is entered, Tenant shall immediately pay and satisfy such judgment.

### 9.3.3   Lessor's Right to Cure

If Tenant is in default in paying any charge for which a lien claim and suit to foreclose the lien have been filed, and Tenant has not given Lessor adequate security to protect the Leased Premises and Lessor from liability for such claim of lien, Lessor, after ten (10) days notice to Tenant, may (but shall not be required to) pay the claim and any associated costs, and the amount so paid, together with reasonable attorneys' fees incurred in connection with such payment, shall be immediately due and owing from Tenant to Lessor.

### 9.3.4   Notice of Lien

If any claim of lien is filed against the Leased Premises or any action affecting the title to the Leased Premises or the property therein is commenced, the party receiving notice of such lien or action shall immediately give the other party written notice thereof.

### 9.3.5   Notice of Non-Responsibility

Lessor or its representatives shall have the right to post and keep posted on the Leased Premises notices of non-responsibility, or such other notices which Lessor deems proper for the protection of Lessor's interest in the Leased Premises. Tenant shall, before commencing any work which might result in the filing of a lien, give Lessor written notice of its intention to so commence work in sufficient time to enable Lessor to post such notices.

## SECTION 10.          IMPROVEMENTS

### 10.1   Construction of Improvements

10.1.1  Tenant hereby covenants and agrees to construct on the Leased Premises a sixteen (16) screen motion picture theater complex (the "Improvements"), in accordance with the plans and specifications (the "Plans") to be prepared by Doug Walton Architects, subject to the approval of Lessor, which approval shall not be unreasonably withheld. The Improvements principally will consist of a multi-screen theatre building having a footprint not to exceed 65,000 square feet, containing up to 3,000 theater seats. Tenant shall be responsible for constructing the Improvements and the sidewalks which abut the Improvements. Subject to Tenant's reimbursement obligations set forth herein, Lessor shall: (i) rough grade and compact the building pad for the Leased Premises and tender the same to Tenant for commencement of construction; (ii) install all utilities (sanitary sewer, store water, telephone, potable water, electricity and natural gas lines) to a boundary of the building pad, at locations approved by Tenant; (iii) construct and install the parking area (for at least 750 spaces), landscaping and other improvements to be constructed upon the Leased Premises beyond the sidewalks abutting the Improvements; (iv) construct and install the common roadways, walkways, driveways, signage and other common areas and improvements of the Shopping Center situated outside of the boundaries of the Leased Premises more particularly described on Exhibit D attached hereto and (v) construct certain off-site improvements required by Clark County, including road

improvements, flood control and burial of power lines (collectively "Lessor's Work"). Lessor shall complete the portion of Lessor's Work described in Section 10.1.1(i) and any other part of Lessor's Work required to enable Tenant to obtain building permits f Improvements as and when Tenant is ready to commence constructi 2/1/98 ; the portion of Lessor's Work required to be complete of occupancy for the Improvements shall be completed as and when business, but not earlier than _August 1_, 1998; and Lessor shall Shopping Center within a reasonable time thereafter. Lessor's archit provide the design work for Lessor's Work. Lessor and Lessee shall efforts to review and approve the preliminary drawings, floor plans a Improvements and Lessor's Work on or before _January 1_, unreasonably withhold or delay their approval of the same. Notwiths contrary contained herein, the Commencement Date shall not be deen shall be due hereunder) until such time as Lessor's Work has been co required to be completed by Lessor to permit issuance for a certificati Improvements has been completed. If Lessor fails to complete Lesso required to be performed by Lessor as a condition to issuance for a ce the Improvements, then Tenant, after ten (10) days notice to Lessor, may complete such work for the account of and at the expense of Lessor. Upon completion of Lessor's Work and all other work of Lessor required for issuance of a certificate of occupancy for the Improvements, Tenant shall pay Lessor no more than a sum equal to the product of $4.00 multiplied by the number of square feet of land contained in the Leased Premises as Tenant's contribution to the cost of such work. Off-site signage shall be constructed at the location shown on the Site Plan for purposes of advertising the theater business to be conducted on the Leased Premises and other businesses, the design of such off-site signage to be subject to the approval of Lessor (which approval shall not be unreasonably withheld or delayed) and all governmental authorities having jurisdiction thereof. Tenant shall pay its proportionate share of the cost of constructing, operating and maintaining such signage based on its use of the same (a ratio of the square footage of Tenant's sign panels to all sign panels on such sign). The Improvements and work to be performed by Lessor shall be constructed in a good and workmanlike manner in compliance with all applicable permits, authorizations, building codes, and all other applicable laws, ordinances, rules and regulations of any governmental authorities having jurisdiction. Lessor and Tenant acknowledge and agree that some of the parking capacity required for the operation of the Leased Premises will be provided through the cross-parking rights created by and among the owners and operators of the Leased Premises and adjoining parcels of land in the Shopping Center pursuant to the provisions of the CC&RS. Lessor agrees not to modify the Site Plan in any respect which would materially reduce the ability of Tenant's patrons and invitees to use other parking areas in the Shopping Center as contemplated by the CC&RS. Lessor also agrees to provide sufficient parking for space to the Shopping Center leased by Lessor to third parties and to require all fee owners and ground lessees of pads in the Shopping Center to provide sufficient parking to comply with all requirements of governmental authorities having jurisdiction over the Shopping Center. In conjunction with the construction of the Improvements, Tenant, at Tenant's cost, will be obligated to provide all furniture, fixtures and equipment required to outfit the cinema complex as an operating motion picture theater and all auditoriums will be equipped with THX

Handwritten margin notes:

43,560 . X
8 . 5 =
370,260 . 00 *

370,260 . 00 X
3 . 25 =
1,203,345 . 00 *

$4,6, 1101, 0, 28050, 2

28050 - Act 111
Reimbursement

$3.25

wbn

sign

Colonnade

sound, digital sound systems and stadium-style riser seating. Tenant shall have no right, authority, or power to bind Lessor, or any interest of Lessor in the Leased Premises, for any claim for labor or material or for any other charge or expense incurred in the construction of the Improvements or any change, alteration, or addition thereto, or any replacement or substitution therefor, nor to render the Lessor's interest in the Leased Premises liable to any lien or right of lien for any labor or material or other charge or expense incurred in connection therewith, and Tenant shall in no way be considered as the agent or partner of Lessor in the construction, erection, or operation of the Improvements or any replacement or substitution therefor. Tenant shall cause its contractor to obtain a payment and performance bond covering the work to be performed by or at the direction of Tenant.

10.1.2  No approval of designs, site plans, plans, specifications, or other matters by Lessor shall be construed as representing or implying that such designs, site plans, plans, specifications, or other matters will, if followed, result in properly designed improvements. Such approvals shall in no event be construed as representing or guaranteeing that any improvements will be built in a workmanlike manner, nor shall such approvals relieve Tenant of its obligation to construct the Improvements in a workmanlike manner as provided in Section 10.1.1.

10.1.3  Lessor and Tenant hereby covenant and agree to cooperate and to use their reasonable best efforts to obtain all necessary governmental approvals for construction of the Improvements.

## 10.2   Construction of Additional Improvements.

Except for the Improvements and any temporary improvements necessary or ancillary to the construction of the Improvements, such as construction shacks, trailers, and the like, Tenant may not construct or place or cause to be constructed or placed on the Leased Premises any building or structure, whether temporary or permanent, without Lessor's prior written approval, which approval shall not be unreasonably withheld or delayed.

## 10.3   Ownership of Improvements

Title to all Improvements and all equipment, fixtures, and machinery therein contained and all furniture and furnishing of Tenant therein erected, constructed, installed or placed shall be and remain in Tenant during the Term of this Lease. Upon the expiration or termination of this Lease, title to all improvements and fixtures then owned by Tenant and situated on the Leased Premises automatically shall vest in Lessor and Tenant shall have no claim thereto; provided, however, that Tenant shall retain title to all furniture, furnishings, office machinery, equipment, screens, projection equipment, snack bar equipment, theatre seats and other fixtures and items of personal property of a similar or dissimilar nature and Tenant may, at its option, remove such items of property from the Leased Premises upon expiration of the Lease Term provided Tenant is not in default hereunder and that Tenant repairs any damage that may be caused to the Improvements in connection with such removal; any items of property not removed by Tenant upon expiration of the term shall be deemed to have been abandoned by Tenant.

### 10.4   Alterations

Tenant shall have the right, from time to time, to make additions, alterations and changes in or to the Improvements, provided that Tenant is not then in default in the performance of any of its obligations hereunder and Tenant fully complies with all of the following provisions (and any other applicable provisions contained in this Lease):

(a)   No structural alterations and no alteration of the architectural design of the exterior portion of the Improvements, the building site plan or the exterior Improvements signage shall be commenced except after receipt of Lessor's written approval thereof, which shall not be unreasonably withheld;

(b)   No alteration shall be undertaken until Tenant shall have procured and paid for all required permits and authorization of all governmental authorities having jurisdiction;

(c)   No alteration which would cost in excess of $250,000 (1997 constant) to complete shall be made except in substantial accordance with detailed plans and specifications (and cost estimates if requested by Lessor) prepared by Tenant and approved in writing by Lessor and, at Lessor's option, by an independent architect retained by and paid by Lessor;

(d)   Any alteration shall be made within a reasonable time, in a good and workmanlike manner, and in compliance with all applicable permits, authorizations, buildings codes, and all other applicable laws, ordinances rules, and regulations of any governmental authorities having jurisdiction; and

(e)   Tenant shall obtain and maintain in existence such insurance as Lessor may reasonably require with regard to the alterations.

Lessor will give prompt written notice to Tenant of any matter Lessor disapproves of under this Section 10.4, stating with specificity the reason for such disapproval.

### 10.5   Construction of New Improvements

At any time after the initial construction of the Improvements described in Section 10.1 has been completed, Tenant may demolish or remove the Improvements and other improvements then located on the Leased Premises, provided that Tenant shall construct new improvements in place thereof, and provided further that:

(a)   Lessor's prior written Consent to such action is obtained, which consent shall not be unreasonably withheld (Lessor may withhold consent to any new improvements that may increase theatre capacity, alter traffic patterns, reduce the number of available parking spaces or require additional parking in connection therewith);

RECEIVED TIME   NOV. 4.   2:22PM

(b)     Tenant is not then in default in the performance of any of its obligations hereunder;

(c)     The replacement improvements are at least equal in value to the improvements removed or replaced;

(d)     No work shall be commenced until Tenant shall have procured and paid for all required permits and authorizations of all governmental authorities having jurisdiction over the Leased Premises;

(e)     Detailed plans and specifications, including but not limited to the site plan, the architectural design, and the signage (and cost estimates, if required by Lessor) for the replacement improvements shall be approved in writing by Lessor and, at Lessor's option, by an independent architect retained by and paid by Lessor, prior to the commencement of any work, such approval not to be unreasonably withheld;

(f)     All work shall be performed in accordance with such plans and specifications (and cost estimates, if so requested) in a lien free and good and workmanlike manner within a reasonable time in compliance with all applicable permits, authorizations, building codes, laws, ordinances, rules and regulations of any governmental authorities having jurisdiction; and

(g)     Tenant shall obtain and maintain in existence such insurance as Lessor may reasonably require with regard to such demolition, removal, replacement and construction.

## SECTION 11.     INDEMNIFICATION

Each party hereto (an "Indemnitor") covenants and agrees to indemnify, defend, save and hold the other party (an "Indemnitee"), the Leased Premises and the Shopping Center free, clear and harmless from all liabilities, losses, costs, expenses (including attorneys' fees), judgments, claims, liens and demands of any kind whatsoever in connection with, arising out of, or by reason of any act, omission, or gross negligence of the Indemnitor, its agents, employees, servants, contractors, sublessees, licensees, customers or business invitees while in, upon, about, or in any way connected with, the Leased Premises, Shopping Center or the Common Areas, subsequent to the date hereof, including (without limitation) any breach by the Indemnitor of Environmental Laws.

For purposes of this Lease, "Environmental Laws" means all Federal, state and local laws and regulations to which the Leased Premises are subject and pertaining to protection of human health and the environment.

## SECTION 12.        DEFAULT, INSOLVENCY, LESSOR'S REMEDIES

### 12.1    Default

It shall be a default and breach of this Lease if any of the following shall occur at any time during the Lease Term:

(i)      Tenant shall fail to make payment of any installment of rent or of any other sum herein specified to be paid by Tenant on or before the date the same shall become due, and such failure shall continue for a period of fifteen (15) days after notice of such default is given to Tenant;

(ii)      Tenant shall fail to observe or perform any of Tenant's other covenants, agreements or obligations hereunder or under the CC&RS, and such failure shall continue for a period of thirty (30) days after notice of such default is given to Tenant; provided, however, that Tenant shall be deemed to have cured the failure if, within said period, Tenant commences to cure the failure, in good faith and with due diligence, and subsequently completes the curing thereof; or

(iii)      If a petition to have Tenant adjudicated a bankrupt or any other proceeding under any Federal or state law relating to bankruptcy, bankruptcy reorganization, insolvency or relief of debtors shall be filed or instituted by Tenant or shall be filed or instituted against Tenant and not be dismissed within 90 days from the date of such filing or institution (or such later date as any motion for dismissal filed within said 90-day period shall be first heard by the court), or if a receiver, guardian, conservator, trustee or assignee, or any other similar officer or person shall be appointed to take charge of all or part of Tenant's property, and provided that such appointment is not vacated within 90 days thereafter (or such later date as any motion for dismissal filed within said 90-day period shall be first heard by the court).

### 12.2    Remedies on Default

In the event of any such material default, Lessor may at its option elect to terminate this Lease and retake possession of the Leased Premises and the Improvements, and thereupon all Tenant's rights granted hereunder shall come to an end and Tenant hereby covenants to peaceably and quietly surrender the Leased Premises to Lessor and to execute and deliver to Lessor such instruments as shall be required by Lessor, as will properly evidence termination of Tenant's rights hereunder and its interest herein. The right of Lessor to terminate this Lease as herein provided shall not be exclusive, and Lessor shall be entitled to all other remedies available under the laws of the State of Nevada as the result of Tenant's breach of this Lease. Without limiting the generality of the foregoing, should Lessor terminate this Lease prior to completion of the Improvements by Tenant, then Tenant shall assign to Lessor all of its rights and interests in the Plans and engineering, construction and architectural contracts pertaining to the Improvements.

## SECTION 13.        CONDEMNATION; CASUALTY

### 13.1    Total Condemnation

If the entire Leased Premises shall be taken as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, this Lease shall terminate and expire as of the date that physical possession of the Leased Premises is taken.

### 13.2    Partial Condemnation

If more than twenty percent (20%) of the area of the Leased Premises is taken and the part remaining is not susceptible to the continued conduct of the business then conducted thereon, or if, regardless of whether any part of the Leased Premises is so taken, the Leased Premises are so damaged by the taking of access or similar valuable rights thereon or in connection therewith that the Leased Premises are thereafter not susceptible to such use, then, and in either of such events, Tenant may elect to terminate this Lease by giving Lessor written notice. Such election, to be effective, must be exercised on or before the expiration of sixty (60) days after the taking, and the termination shall be effective as of the date physical possession is taken. If Tenant shall elect not to terminate this Lease under this subsection 13.2, or if, under the provisions of said subsection Tenant shall not have the right to make an election to terminate this Lease, then, and in either of such events, this Lease shall remain in full force and effect as to the portion of the Leased Premises remaining after such taking, and the Minimum Annual Rent hereunder shall be reduced by an amount equal to the reduction in the fair rental value of the entire Leased Premises on account of said taking. If Lessor and Tenant are unable to agree upon such reduction, the matter shall be submitted to arbitration in the manner provided for in subsection 13.4 below.

### 13.3    Condemnation Proceeds

All awards and other payments on account of a taking, less costs, fees and expenses incurred in the collection thereof ("net award"), shall be paid to Lessor and Tenant in the following order of priority:

(i)      First, to Lessor, an amount equal to the fair market value of the Leased Premises taken, valued for the use then being made but without considering the value of improvements, determined by independent MAI appraisers as provided below;

(ii)      Second, to Tenant, an amount equal to the value of Tenant's interest in the leasehold estate and Improvements, determined by independent MAI appraisers as provided below, as if the Lease Term had not terminated; and

(iii) Third, to Lessor, the balance of the net award.

RECEIVED TIME   NOV. 4.   2:22PM

### 13.4   Appraisal

Not more than thirty (30) days after any taking, Lessor and Tenant shall each appoint one independent MAI appraiser to determine the value of the interest of Lessor or Tenant, or both, as the case may be, and notice of such appointment shall be given to the other party. Such appraisers shall be appointed and such appraisals shall be made in the following manner. Lessor and Tenant shall each select an independent, experienced and duly licensed MAI real estate appraiser and the two appraisers shall thereupon be instructed to select and designate a third appraiser, who shall be engaged by both Lessor and Tenant. If either party shall fail to so designate an appraiser, the other party shall have the right to petition the District Court for the County of Clark, Nevada, to appoint such an appraiser on behalf of the defaulting party, which appraiser shall act on behalf of such party and at such party's sole cost and expense. In the event that such appraisers shall fail to agree on an appraised value of the interest, Lessor and Tenant do hereby agree that the value of the interest shall be established as the average price represented by the two appraisal reports most closely in agreement as to the value of the interest.

### 13.5   Casualty

Should the Improvements be wholly or partially destroyed by fire or any other casualty, Tenant shall promptly repair, replace, restore and reconstruct the same in substantially the form in which it existed prior to such casualty, with at least as good workmanship and quality as the improvements being repaired or replaced and all insurance proceeds related thereto shall be made available to Tenant for such purposes, provided, however, that if such destruction shall have occurred during or after the last two years of the term or any renewal term and the cost of repair and restoration is greater than five percent (5%) of the replacement cost of the Improvements and furniture, fixtures and improvements situated therein, then Tenant may elect to terminate this Lease on sixty (60) days, written notice to Lessor, given within thirty (30) days of the occurrence of the casualty; if Tenant does not elect to terminate, then the Leased Premises shall be rebuilt in accordance with the other provisions of this section. If this Lease is terminated under this provision, then all insurance proceeds allocable to property of Tenant which is subject to removal by Tenant from the Leased Premises upon termination of this Lease shall be paid to Tenant and the balance shall be paid to Lessor, who shall have responsibility for removal of all debris from the Leased Premises.

### SECTION 14.        NOTICES

All notices given under this Lease shall be in writing and delivered personally, by facsimile transmission, certified or registered mail, return receipt requested, or overnight courier that keeps records of deliveries and attempted deliveries (such as Federal Express), and shall be effective upon actual receipt or refusal of delivery (except that a facsimile transmission will be effective upon actual receipt only if followed up with a copy sent by one of the other methods listed above), addressed as follows:          .....

| Tenant: | Eastgate Theatre, Inc. |
|---|---|
| | 919 S.W. Taylor St., Suite 900 |
| | Portland, OR 97204 |

| With a copy to: | Schwabe, Williamson & Wyatt |
|---|---|
| | 1211 SW 5th, Suite 1700 |
| | Portland, Oregon 97204 |
| | Attn: Mark A. Manulik |
| | Fax No. (503) 796-2900 |

| Lessor: | Triple Five Development Group |
|---|---|
| | 9452 West Sahara |
| | Las Vegas, Nevada 89117 |
| | Attn: Stacy Rush |

| With a copy to: | Lionel Sawyer & Collins |
|---|---|
| | 300 South Fourth Street, Suite 1700 |
| | Las Vegas, Nevada 89101 |
| | Attn: Matthew E. Watson |
| | Fax No. (702) 383-8845 |

or to such other address as may be designated by written notice.

## SECTION 15.   WAIVER

No waiver by either party of any provision hereof shall be deemed a waiver of any other provisions hereof or of any subsequent breach by the other party of the same or any other provision.

## SECTION 16.   LESSOR'S ACCESS

Lessor and Lessor's agents shall have the right to enter the Leased Premises during normal business hours (upon reasonable notice except in case of emergency) for the purpose of inspecting the same and the improvements located therein and for posting notices of nonresponsibility during construction.

## SECTION 17.   JOINDER IN APPLICATIONS FOR PERMITS, LICENSES, DEDICATION OF LAND, ETC.

Both parties agree that, within ten days after receipt of written request from the other party to do so, such party will join, without cost, expense or liability to such party, in any and all applications for permits, licenses or other authorizations required by any governmental or other body claiming jurisdiction in connection with any construction work or development which the requesting party may perform or desire to perform hereunder and which is in conformance with

the CC&Rs, and such grants by the requesting party for public utility and other easements, local improvement districts, street dedications, street widenings, retention ponds, erosion control, buffer strips, landscaping and such other similar matters as are requested by the requesting party.

## SECTION 18.          MORTGAGE OF LEASEHOLD

18.1    Lessor and Tenant agree that, notwithstanding any other clause in this Lease, Tenant shall have the right, without Lessor's consent, (i) to mortgage or hypothecate Tenant's interest in this Lease, and any amendments thereto to its lender, General Electric Capital Corporation ("Leasehold Mortgagee"), by a recorded mortgage, deed of trust, deed to secure debt, collateral assignment of lease or other similar instrument creating a lien or other encumbrance on Tenant's leasehold estate (a "Leasehold Mortgage"), provided that no Leasehold Mortgage shall have priority over nor affect Lessor's interest in the Leased Premises, and/or (ii) to pledge the stock of Tenant as security for any loan to be granted to Tenant by Leasehold Mortgagee. Tenant hereby notifies Lessor that, coincidental with the execution of this Lease by Tenant, it shall mortgage its interest herein to Leasehold Mortgagee and that it heretofore pledged its stock as security to Leasehold Mortgagee and Lessor specifically consents to the encumbering of Tenant's interest in the Lease pursuant to the Leasehold Mortgage and to the exercise by Leasehold Mortgagee, as the beneficiary thereunder, of any and all of its rights and remedies under the Leasehold Mortgage or as otherwise permitted by law.

18.2    Lessor shall give to Leasehold Mortgagee copies of all notices of default, notices of termination of this Lease and/or notices of termination of the Tenant's right of possession at the same time as, and whenever, Lessor shall give any of the foregoing to Tenant. Any notice or other communication which any party shall desire or is required to give to Leasehold Mortgagee shall be deemed to have been duly given or served if given by that party in accordance with the provisions of the notice provision of this Lease. The address of Leasehold Mortgagee for such purposes is:

> General Electric Capital Corporation
> 201 High Ridge Road
> Stamford, Connecticut 06927
> ATTN:          Commercial Finance Act III Account Manager

with copies to:

> General Electric Capital Corporation
> 201 High Ridge Road
> Stamford, Connecticut 06927
> ATTN:          Commercial Finance - Legal Counsel
>
> Weil Gotshal & Manges
> 767 Fifth Avenue
> New York, New York 10153

ATTN:      Ted S. Waksman, Esq.

18.3    Prior to Lessor's exercise of any of its remedies under this Lease, including terminating this Lease or Tenant's right of possession hereunder, Leasehold Mortgagee shall have the right to remedy the default of Tenant under the Lease, or to cause the subject default under the Lease to be remedied, within the time period, if any, offered hereunder for Tenant to do so, plus an additional ten (10) days in the case of a monetary default, or an additional thirty (30) days in the case of a non-monetary default; provided (i) any cure by Leasehold Mortgagee may be accomplished with reservation of rights, and (ii) Lessor may exercise its rights and remedies hereunder (other than a termination of this Lease or of Tenant's right of possession) at any time allowed by this Lease.

18.4    Lessor agrees to accept any required Tenant performance from Leasehold Mortgagee as if Tenant had tendered such performance, provided, however, that unless Leasehold Mortgagee otherwise agrees in writing, any performance or partial performance by Leasehold Mortgagee under the Lease shall not constitute an assumption of the Tenant's obligations hereunder.

18.5    The exercise and non-exercise of remedies under the Leasehold Mortgage is solely at the election of Leasehold Mortgagee. If Leasehold Mortgagee elects to exercise any of such remedies by reason of Tenant's default under the Lease or the Leasehold Mortgage, Leasehold Mortgagee is not obligated to pursue such remedies if the Tenant's defaults have been corrected or cured.

18.6    Lessor shall not terminate this Lease or Tenant's right of possession hereunder (but may exercise any other right or remedy) by reason of a monetary default (i) as long as Leasehold Mortgagee, in good faith, shall have commenced to cure such default and shall be prosecuting the same to completion with reasonable diligence, subject to force majeure, provided the lapse of the time period for cure required by Leasehold Mortgage would not, in Lessor's reasonable opinion, imminently jeopardize Lessor's interest in the property, the Leased Premises or in any improvements thereon, or (ii) if possession of the Leased Premises by Leasehold Mortgagee is required in order to cure such default, as long as Leasehold Mortgagee, in good faith institutes foreclosure proceedings under the Leasehold Mortgage or other proceedings to acquire the stock of Tenant and, thereafter, as long as such proceedings shall have been instituted and shall be prosecuted with reasonable diligence, provided the lapse of the time period for cure required by Leasehold Mortgage would not, in Lessor's reasonable opinion, imminently jeopardize Lessor's interest in the property, the Leased Premises or in any improvements thereon.

18.7    Lessor acknowledges that Tenant may agree with Leasehold Mortgagee that, without the Leasehold Mortgagee's prior written consent in each instance, this Lease shall not be assigned by Tenant or modified, amended, canceled, extended or otherwise changed in any manner which would increase the monetary obligations of Tenant hereunder, materially increase any of the other obligations of Tenant hereunder or materially and adversely affect any of the rights of Tenant hereunder.  Execution of any amendment to this Lease or other document by

Tenant may be conclusively relied upon by Lessor as representing that Tenant has obtained any necessary consent.

18.8    In the event of the termination of this Lease by reason of any default hereunder, upon Leasehold Mortgagee's written request, made within ten (10) business days after Lessor has given to Leasehold Mortgagee written notice of any such termination, Lessor, within fifteen (15) days after receipt of such request, shall prepare and deliver to Leasehold Mortgagee or its designee or nominee a new form of lease for the Leased Premises for execution by Leasehold Mortgagee, for the remainder of the term of this Lease upon all of the terms, covenants and conditions of this Lease and Leasehold Mortgagee shall execute such new lease (except that such new lease shall provide that Leasehold Mortgagee or its designee shall be released from liability thereunder upon an assignment of the new lease to a Designated Assignee [defined below]), provided that all Minimum Annual Rent and Percentage Rent accrued but unpaid at the time of such termination are tendered to Lessor with Leasehold Mortgagee's request. In the event Leasehold Mortgagee does not request such a new lease, Leasehold Mortgagee shall have the right to enter on the Leased Premises for a period of twenty (20) days after expiration of the time period for such request for the purpose of removing any Collateral (hereinafter defined) of Tenant therefrom, provided Leasehold Mortgagee shall repair, during such time, any damage caused by such removal.

18.9    Upon the exercise of any of the remedies contained in the Leasehold Mortgage, such that the interest of Tenant is foreclosed upon, sold, transferred or otherwise terminated by Leasehold Mortgagee, Lessor agrees:

(a)    That any such termination or transfer of Tenant's interest in the Lease shall not terminate the Lease, but the Lease shall be fully assignable to Leasehold Mortgagee or a Designated Assignee (hereinafter defined);

(b)    To execute such reasonable amendments to the Lease or instruments as may be necessary or desirable to evidence or effectuate the transfer described in Section 18.9(a) above, provided such amendments do not adversely affect Lessor;

(c)    Upon the request of the transferee described in Section 18.9(a) above or Leasehold Mortgagee, to execute a new lease with such transferee or Leasehold Mortgagee upon the same terms and conditions as the Lease.

18.10   Except for such period of time as Leasehold Mortgagee or its designee is actually the owner of Tenant's interest in the Lease, neither Leasehold Mortgagee nor its transferee shall be liable to perform any of Tenant's obligations under this Lease. In the event that Leasehold Mortgagee shall at any time hold the Tenant's interest under the Lease or any new lease entered into in replacement thereof, then, upon any sale, transfer or assignment thereof by Leasehold Mortgagee to a Designated Assignee, Lessor agrees that such transfer shall automatically release Leasehold Mortgagee from any liability under the Lease or any successor lease occurring after the date-of such sale, transfer or assignment.

18.11   In the event that a trustee in bankruptcy, or the Tenant as debtor-in-possession under the Federal Bankruptcy Code (the "Code"), as now or hereafter in effect, or any similar such officer or official shall exercise any right or power to reject the Lease under the provisions of the Code or any similar law, Lessor agrees that, prior to terminating the Lease, Lessor, at the option of Leasehold Mortgagee, will enter into a new Lease with leasehold Mortgagee or its nominee upon the terms and conditions provided in Section 18.8. Rejection of the Lease by Lessor or on Lessor's behalf under the Code shall not operate to terminate Leasehold Mortgagee's security in the Lease but such interest shall attach to Tenant's rights to possession and other rights under the provisions of Section 365(h) of the Code.

18.12   Leasehold Mortgagee shall have the right, without Lessor's consent, to foreclose the Leasehold Mortgage or accept an assignment of the Tenant's interest on this Lease in lieu of foreclosure of the Leasehold Mortgage, or to acquire the stock of the Tenant pursuant to any Loan Documents or any applicable law. In the event Leasehold Mortgagee forecloses the Leasehold Mortgage, or accepts an assignment of the Lease in lieu of foreclosure of the Leasehold Mortgage, or acquires the stock of the Tenant pursuant to any Loan Document or any applicable law, and in such event Leasehold Mortgagee acquires Tenant's interest in the Lease or the stock of Tenant, either as a purchaser at any foreclosure sale, or by reason of the assignment of the Lease in lieu of foreclosure, or otherwise, then Leasehold Mortgagee shall have the right to further assign the Lease or transfer the stock of Tenant, subject to the terms of this Lease. Nothing in this Section shall limit Lessor's compliance with any applicable notice and cure period requirements, or the right of Lessor to require performance hereunder during any foreclosure proceeding.

18.13   Lessor hereby consents to Tenant's grant to Leasehold Mortgagee of a security interest in Tenant's interest in Tenant's property (for purposes of this Section, the "Collateral") and recognizes that each and every right which Lessor now has or hereafter may have, either to levy upon the Collateral or to claim or assert title to the Collateral, whether under the Lease or the laws of the State of Nevada, or under any other applicable Federal, state, municipal or local law, ordinance or otherwise, or under any mortgage now in effect or hereafter executed, whether by reason of a default under the Lease or otherwise, shall be subject and subordinate in every respect to all of the terms, provisions and conditions of the Leasehold Mortgage (provided such do not alter the terms of this Lease) and to the Leasehold Mortgagee's security interest in the Collateral.

18.14   Leasehold Mortgagee may, without affecting the validity of this Section, extend the time of payment of any indebtedness of Tenant to Leasehold Mortgagee or alter the performance of any of the terms and conditions of any agreement between Tenant and Leasehold Mortgagee and any Loan Documents, without the consent of Lessor and without in any manner whatsoever impairing or affecting the Leasehold Mortgage or the security interest in the Leased Premises or the pledge of the stock of Tenant.

18.15   As used herein, the term "Leasehold Mortgage" shall mean each and every recorded mortgage, deed of trust, deed to secure debt, collateral assignment of lease or other

similar instrument creating a lien or other encumbrance on Tenant's leasehold interest and any modification of any of the terms thereof, including, without limitation, any extension, renewal or refinancing of the indebtedness secured thereby or an additional advance or other future sum secured by the Leasehold Mortgage or an additional Leasehold Mortgage given to secure any existing or future indebtedness of Tenant to Leasehold Mortgagee.

18.16   The provisions of this Section are binding upon and inure to the benefit of the parties hereto, their successors and assigns, including specifically Leasehold Mortgagee, on its behalf and as agent for other lenders, and its successors and assigns. Any other institutional lender (i) who makes a loan to Tenant, all or a portion of the proceeds of which are used to pay in full all amounts due to Leasehold Mortgagee, and (ii) whose loan is secured by a first priority security interest in Tenant's interest hereunder, shall thereafter be recognized as the "Leasehold Mortgagee", as shall any such subsequent generation refinancer.

18.17   In the event Tenant desires to mortgage, pledge or encumber its interest in the Leased Premises and/or in this Lease, other than to a Leasehold Mortgagee, Tenant shall have the right to do so (if it obtains Lessor's consent as required by this Lease), provided no such encumbrance shall have priority over nor affect Lessor's interest and estate in the Leased Premises.

18.18   When, under this Lease, Tenant is required to execute a document, Tenant shall also cause necessary ancillary documents to be executed and delivered to Leasehold Mortgagee (and/or any encumbrance holder) where necessary to fully effectuate the purposes hereof.

18.19   As used herein, "Designated Assignee," shall mean any corporation, partnership, individual or business entity which is an experienced theatre operator with a history and reputation of showing high-quality, first-run movies in motion picture theaters, on at least a total of fifty (50) screens. Such entity must have a net worth of at least Ten Million Dollars ($10,000,000) (1997 constant) as of the effective date of the proposed assignment.

18.20   Notwithstanding anything to the contrary contained herein, any time periods within which Leasehold Mortgagee is required to act hereunder shall be extended by a period equal to the time Leasehold Mortgagee is restrained from exercising its remedies under the Leasehold Mortgage pursuant to the automatic or any other stay provision or order or injunction issued or in force pursuant to the Code.

## SECTION 19.  PERFORMANCE ON BEHALF OF TENANT

If Tenant shall fail to make any payment or perform any act required hereunder to be made or performed by Tenant, then Lessor (after such notice to Tenant, if any, as may be reasonable under the circumstances) may, but shall be under no obligation to, make such payment or perform such act with the same effect as if made or performed by Tenant. Entry by Lessor upon the Leased Premises for such purpose shall not waive or release Tenant from any obligation or default hereunder. Tenant shall reimburse Lessor for all sums so paid by Lessor

and for all costs and expenses incurred by Lessor in connection with the performance of any such act.

## SECTION 20. ESTOPPEL STATEMENT

Lessor and Tenant shall, upon not less than ten (10) days prior request by the other, promptly execute, acknowledge and deliver to the requesting party a written statement certifying (a) that this Lease is unmodified and in full force and effect (or if there have been any modifications, that the same is in full force and effect as modified and stating the modifications), (b) the dates, if any, to which the rent and other sums payable hereunder have been paid, and (c) whether to the knowledge of Lessor or Tenant, as the case may be, there are then existing any defaults under this Lease or any defenses or offsets to the payment of rent and other charges and, if so, specifying the same. Any such statement delivered pursuant to the foregoing may be relied upon by any prospective purchaser or mortgagee (including assignees) of the fee interest in the Leased Premises or the leasehold estate created hereby.

## SECTION 21. CONVEYANCE BY LESSOR AND RIGHT OF FIRST OFFER

### 21.1   Conveyance By Lessor

The term "Lessor," as used in this Lease, so far as the covenants and obligations on the part of Lessor are concerned, shall mean only the owner or owners of the Leased Premises at the time in question, and, in the event of any transfer or transfers of title thereto, the Lessor named (and, in the case of any subsequent transfer, the then grantor) shall be released from the date of such transfer of all personal liability as respects the performance of any covenants or obligations by Lessor thereafter to be performed; provided that any funds in the hands of Lessor or the then grantor, at the time of such transfer, in which Tenant has an interest shall be delivered to the grantee.

### 21.2   Right of First Offer

If, during the term of this Lease, Lessor desires to sell fee title to the Leased Premises or any portion of the Shopping Center that includes the Leased Premises, Lessor shall offer such property for sale to Tenant before listing or offering such property for sale to any other party. Lessor's written notice (the "Offer") to Tenant shall include the purchase price and other terms and conditions of sale as necessary to form a valid contract upon acceptance by Tenant. For a period of 30 days following Tenant's receipt of the Offer, Tenant shall have the right to accept Lessor's offer by so notifying Lessor in writing within the aforesaid 30-day period. If Tenant shall so notify Lessor of its election to purchase said property, Lessor and Tenant hereby agree to execute and to deliver to each other a contract of sale for such property, which contract shall include the terms and conditions and provisions of the Offer. Any purchase of such property by Tenant shall be closed within ninety (90) days of Tenant's acceptance of the Offer. If Lessor shall deliver the Offer and Tenant shall not advise Lessor of its election to purchase within the aforementioned 30-day period, this right of first offer shall terminate, Tenant shall promptly

execute in recordable form any instrument reasonably necessary to document such termination, and Lessor may proceed to close any sale of such property to another person on economic terms no more favorable than those offered to Tenant (any offer more favorable to the purchaser than the Offer shall be resubmitted to Tenant for acceptance or rejection as provided above).

## SECTION 22.  MISCELLANEOUS

### 22.1   Short Form Lease

Upon the request of either Lessor or Tenant after Lessor obtains fee title to the Leased Premises, the parties hereto shall each execute, acknowledge and cause to be recorded a memorandum of this Lease which shall set forth the description of the Leased Premises, the Lease Term, the Renewal Terms, the right of first offer and such other information respecting this Lease as may be agreed upon by Lessor and Tenant.

### 22.2   Holding Over

If Tenant holds over after the termination of this Lease, such holding-over shall not be considered as being a renewal of this Lease, and such holding-over shall be construed to be a tenancy from month to month only, at 110% of the last rent (including both Minimum Annual Rent and Percentage Rent) charged under this Lease and under the same terms and conditions as are provided in this Lease.

### 22.3   Entire Agreement

Except as may be specifically referred to herein, there are no covenants, promises, agreements, conditions or understandings, either oral or written, between the parties hereto, other than as herein set forth.  No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Lessor or Tenant unless reduced to writing and signed by them.  This instrument shall supersede any and all prior agreements of the parties hereto with respect to the subject matter hereof.

### 22.4   Mediation

In the event of any dispute arising under this Lease or concerning its interpretation, except for the nonpayment of Rent by Tenant, Lessor and Tenant hereby agree to submit, in good faith, any such dispute to mediation.

### 22.5   Attorneys' Fees

If suit or action is commenced to enforce compliance with any term, covenant or condition of this Lease, the party not prevailing shall pay to the prevailing party a sum which the trial judge determines is reasonable as attorneys' fees to be allowed in the suit or action, and court costs, and if appeal is taken from any judgment or decree in the suit or action, the party not

RECEIVED TIME   NOV. 4.   2:22PM

prevailing on the appeal shall pay to the prevailing party such further sum as the appellate court shall adjudge reasonable as attorneys' fees on appeal, and court costs.

### 22.6   Successors

This Lease shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, subject to the provisions of Section 5 hereof.

### 22.7   Force Majeure

The occurrence of any of the following events shall excuse performance of such obligations of Lessor or Tenant as are rendered impossible or reasonably impracticable to perform while such event continues: strikes; inability to obtain required utilities; lockouts; labor disputes; acts of God; inability to obtain labor, materials or reasonable substitutes therefor; governmental restrictions, regulations or controls; judicial orders; enemy or hostile governmental action; civil commotion; fire or other casualty; and other causes beyond the reasonable control of the party obligated to perform.  Notwithstanding the foregoing, the occurrence of such events shall not excuse Tenant's obligations to pay Minimum Annual Rent, Percentage Rent and additional rent or excuse such obligations as this Lease may nevertheless otherwise impose on the party to obey, remedy or avoid, despite such event.

### 22.8   Severability

Any provisions of this Lease determined to be invalid by a court of competent jurisdiction shall in no way affect any other provision hereof.

### 22.9   Interest on Past-Due Obligations

Any amount due from Tenant to Lessor and not paid when due shall bear interest at the rate of twelve percent (12%) per annum.

### 22.10   Captions

Section headings are inserted herein for convenience only and are not intended to construe, modify or interpret the contents of this Lease.

### 22.11   Governing Law

The parties intend that this Lease shall be governed by and construed in accordance with the laws of the State of Nevada applicable to contracts made and wholly performed within Nevada by persons domiciled in Nevada.

.....

RECEIVED TIME   NOV. 4.   2:22PM

SENT BY:LS&U 11th Floor     ;     ;  4-97 ; 2:50PM ;     Livhoi 39  91 ;     ;  900 900 2000/900

### 22.12  No Brokers

Lessor and Tenant each represent and warrant to the other that it has not engaged or had discussions with any broker or agent who would be entitled to any commission or fees in connection with the negotiation or execution of this Lease, and each party agrees to indemnify and hold harmless the other party from and against any and all costs, expenses or liabilities for such commissions or other compensation or charges claimed by or awarded to any other broker or agent on the basis of any assignments or agreements made or alleged to have been made by or on behalf of the indemnifying party.

### 22.13  Nondisturbance and Attornment

Lessor warrants and represents to Tenant that there are no mortgages, deeds of trust, land sale contracts, ground leases or liens applicable to the Leased Premises, provided that Lessor will obtain financing for the purchase and development of the Shopping Center from a commercial lender ("Lender").  On or before the commencement of construction of the Improvements, Lessor, Tenant and Lender shall join in the execution of a subordination, non-disturbance and attornment agreement ("SNDA") in form acceptable to such parties, subordinating this Lease to the lien of the Lender ("Lien") subject to Lender's agreement (i) not to disturb this tenancy so long as Tenant is not in default hereunder, and (ii) to recognize Tenant's rights hereunder, including its rights with respect to casualty insurance proceeds.  Lessor reserves the right to subject and subordinate this Lease at all times to the lien of any mortgage, deed of trust or other encumbrance now or hereafter placed, charged or enforced against Lessor's interest in the Leased Premises.  Any mortgagee under any mortgage, or any beneficiary under any deed of trust, as the case may be, shall join with Tenant in the execution of an instrument in writing (a "Nondisturbance Agreement") under the terms of which such holder of any right or claim, or mortgagee, or beneficiary on behalf of itself and its respective successors in interest or assigns (including any purchaser through foreclosure proceedings) shall, provided Tenant is not then in default, recognize Tenant's interest under this Lease (including Tenant's interest in insurance proceeds as set forth herein) and permit Tenant to remain in quiet possession in the Leased Premises and Tenant shall attorn to such new lessor.  In the event that the mortgagee, beneficiary of any mortgage or deed of trust, or ground lessor elects to make this Lease prior to its mortgage, deed of trust, or ground lease, then and in such event, upon such mortgagee's, beneficiary's or ground lessor's giving written notice to Tenant to that effect, this Lease shall be deemed prior to such mortgage, deed of trust, or ground lease whether this Lease is dated prior to or subsequent to the date of recordation of such mortgage, deed of trust, or ground lease.  Tenant shall, in the event any proceedings are brought for the foreclosure of fee title to the Leased Premises or in the event of exercise of the power of sale under any deed of trust made by Lessor covering the Leased Premises, or termination of any ground lease, attorn to the purchaser upon any such foreclosure or sale, or ground lessor, as the case may be, and recognize such purchaser or lessor as the landlord under this Lease.

.......

### 22.14   Landlord and Tenant

Nothing contained in this Lease shall be deemed or construed by the parties hereto or by any third party to create the relationship of principal and agent or of partnership or of joint venture or of any association whatsoever between Lessor and Tenant, it being expressly understood and agreed that neither the computation of rent nor any other provision contained in this Lease nor any act or acts of the parties hereto shall be deemed to create any relationship between Lessor and Tenant other than the relationship of landlord and tenant.

### 22.15   Authority

The persons executing this Lease on behalf of Tenant and Lessor covenant and warrant to the other party that (a) they are duly authorized to execute this Lease on behalf of the party for whom they are acting, and (b) the execution of this Lease has been duly authorized by the Board of Directors of the party for whom they are acting.

### 22.16   Exclusivity; Right of First Opportunity

As an express inducement to Tenant to enter into this Lease, Lessor agrees that neither Lessor nor any entity owned by, controlled by or under common control with Lessor (a "Lessor Affiliate") shall permit any other motion picture theatre to be constructed or operated upon any land owned by Lessor or any Lessor Affiliate within the Shopping Center. If Lessor or a Lessor Affiliate, during the Lease Term or any Renewal Term, decides to develop a new theatre or theatre complex at any other property within five (5) miles of the Leased Premises and Tenant is not then in default hereunder, then Lessor shall first offer the right to participate in the development, construction and operation of such theatre or theatre complex to Tenant, before offering the right to participate in such development to any other cinema operator. The parties agree to negotiate such development opportunity in good faith. If Lessor and Tenant are unable to conclude an agreement with respect to such development, then Lessor shall be free to negotiate the sale or lease of the subject development to another cinema operator.

### 22.17   Operation of Business

Discontinuance of operations at the Leased Premises by Tenant in excess of ninety (90) days (excluding events of force majeure, discontinuance due to damage or destruction of the Leased Premises, redecoration, remodeling and/or refurbishing of the Leased Premises), shall be deemed to be an event of default hereunder if not cured within thirty (30) days of written notice thereof to Tenant.

### 22.18   CC&Rs

Lessor and Tenant shall use their good faith, best efforts to negotiate, execute and record the CC&Rs on or before January 31, 1998, and the terms of the same shall be consistent with the

terms of this Lease and similar instruments generated for shopping centers similar to the
Shopping Center.

### 22.19   Title to Leased Premises

Lessor and Tenant acknowledge that Lessor does not yet have title to the Leased Premises
or the Shopping Center, but will take assignment of a purchase agreement ("Purchase
Agreement") to purchase same. Lessor shall use commercially reasonably efforts to close the
purchase of the Shopping Center pursuant to the terms of that agreement. Lessor anticipates that
the closing for the purchase of the Leased Premises and the Shopping Center will be completed
by December 31, 1997. Should such closing not occur by February 1, 1998, either
party may terminate this Lease upon written notice to the other party until such time as the
closing does occur; provided that if such closing does not occur by such date, or if Lessor notifies
Tenant of its inability to complete such closing, then Tenant may, within ten (10) days of such
date or notification, terminate this Lease and take an assignment of the Purchase Agreement. If
Tenant elects to take an assignment of the Purchase Agreement, Lessor shall assign its interest in
the Purchase Agreement and Tenant shall pay to Lessor the amount of any deposits made under
the Purchase Agreement and shall reimburse Lessor for its reasonable out of pocket costs
regarding the development of the Shopping Center (including, without limitation, architectural,
construction and engineering fees, but excluding attorney's fees) that benefits the Shopping
Center, and all information regarding such development shall be turned over to Tenant by Lessor.
If Tenant elects not to take an assignment of the Purchase Agreement, then this Lease shall
terminate and be of no further force or effect and neither party shall have any further liability to
the other.

LESSOR:   PEBBLE COMMERCIAL CENTER, LLC,
         a Nevada limited liability company

By: _____
    Stacy Rush, Manager


TENANT:   EASTGATE THEATRE, INC.
         an Oregon corporation

By: _____
Name: W. S. Aman
Title: President

EXHIBIT A

# Colonnade Square at Pebble

Eastern Avenue and Pebble Road, Clark County, Nevada

Theater Lease Premises Exhibit

Perlman
Architects, Inc.
2230 Corporate Circle, Suite 200
Henderson, Nevada 89014

EXHIBIT B

## Retail Suites Legend

**Retail A**

| | |
|---|---|
| Suite 100 | 1,500 sf |
| Suite 101 | 1,500 sf |
| Suite 102 | 1,500 sf |
| Suite 103 | 1,000 sf |
| Suite 104 | 2,356 sf |
| Suite 105 | n/a |
| Suite 106 | 4,000 sf |
| Common | 144 sf |
| Total | 12,000 sf |

**Retail B**

| | |
|---|---|
| Suite 100 | 3,657 sf |
| Suite 101 | 2,200 sf |
| Suite 102 | 1,500 sf |
| Suite 103 | 1,500 sf |
| Suite 104 | 3,000 sf |
| Common | 143 sf |
| Total | 12,000 sf |

**Retail C**

| | | | |
|---|---|---|---|
| Suite 100 | 1,500 sf | Suite 109 | 1,500 sf |
| Suite 101 | 1,500 sf | Suite 110 | 1,500 sf |
| Suite 102 | 1,500 sf | Suite 111 | 1,436 sf |
| Suite 103 | 1,500 sf | Suite 112 | 1,436 sf |
| Suite 104 | 1,436 sf | Suite 113 | 1,500 sf |
| Suite 105 | 1,436 sf | Suite 114 | 1,500 sf |
| Suite 106 | 1,500 sf | Suite 115 | 1,500 sf |
| Suite 107 | 1,500 sf | Suite 116 | 1,485 sf |
| Suite 108 | 1,500 sf | Common | 271 sf |
| | | Total | 25,500 sf |

Typical Parking Spaces

# Colonnade Square at Pebble

Eastern Avenue and Pebble Road, Clark County, Nevada

Conceptual Master Development / Site Plan - Scheme V

Perlman Architects, Inc.
2230 Corporate Circle, Suite 200
Henderson, Nevada 89074

EXHIBIT C

Preliminary Title Report

See Attached

## UNITED TITLE OF NEVADA

3980 Howard Hughes Parkway #100, Las Vegas, NV 89109

# PRELIMINARY REPORT

Order No. 97125217

Escrow Officer: Angelina S. Galindo
2300 W. Sahara, #140
Las Vegas, NV 89102
Phone Number: (702) 251-4777

Title Officer: Wayne Gillins
3980 Howard Hughes Parkway #100
Las Vegas, Nevada 89109
Phone Number (702) 836-8000

Buyer / Borrower:

In response to the above referenced application for a policy of title insurance, United Title of Nevada hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a California Land Title Association Standard Coverage form of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception below, or not excluded from coverage pursuant to the printed schedules, conditions and stipulations of said policy form.

This report (and any supplement or amendments thereto) is issued for the purpose of facilitating the issuance of a policy of title insurance.

Dated: October 9, 1997 at 7:30 AM

Wayne Gillins – Title Officer

The estate or interest in the land hereinafter described or referred to covered by this report is:

Fee Simple

Title to said estate or interest at the date hereof is vested in:

H & M Corporation, a Nevada Corporation

The land referred to in this report is described as follows:

The South Half S 1/2) of the Southwest Quarter (SW 1/4) of the Southwest Quarter (SW 1/4) of Section 13, Township 22 South, Range 61 East, M.D.B. & M.

EXCEPTING THEREFROM those portions of land as conveyed to Clark County by Deeds recorded January 24, 1973 in Book 296, as Document No. 255658, May 26, 1994 in Book 940526, as Document No. 01606, and July 23, 1996 in Book 960723, as Document No. 01388 of Official Records, Clark County, Nevada.

.....

The following are exceptions to Title:

1. State, County and/or City taxes for the fiscal year 1997-98 a lien in the total amount of $13,861.26
   Parcel No.  : 177-13-402-005
   First installment of $3,466.26 due on or before August 18, 1997       – Paid
   Second installment of $3,465.00 due on or before October 6, 1997      – Delinquent
   Third installment of $3,465.00 due on or before January 5, 1998       – Not Yet Due
   Fourth installment of $3,465.00 due on or before March 2, 1998        – Not Yet Due

2. Special Assessments for improvement purposes:
   Roll No.              : 5085
   City                  : Las Vegas
   District No.          : 90
   Current Balance       : $58,549.35
   No. of Installments   : 20 Semi-annual
   Payable each year on or before: August 1st and February 1st
   Status                : Current

3. Any taxes that may be due, but not assessed, for new construction which can be assessed on the
   unsecured property rolls, in the Office of the Clark County Assessor, per Nevada Statute 361.260.

4. Water rights, claims or title to water, whether or not shown by the public record.

5. Mineral rights, reservations, easements and exclusions in patent from the United States of America.
   Recorded        : October 23, 1941 in Book 29 of Deeds, Pages 128-129
   Document No.    : 123294, Official Records.

6. Mineral rights, reservations, easements and exclusions in patent from the United States of America.
   Recorded        : October 25, 1991 in Book 911025
   Document No.    : 00667, Official Records.

7. Mineral rights, reservations, easements and exclusions in patent from the State of Nevada.
   Recorded        : October 7, 1955 in Book 70
   Document No.    : 58626, Official Records.

8. An Easement in a Deed affecting a portion of said land for the purpose stated herein, and incidental
   purposes
   For             : road and utility purposes
   Recorded        : May 15, 1967 in Book 796
   Document No.    : 639710, Official Records.

9. An Easement affecting a portion of said land for the purposes stated herein, and incidental purposes
   In Favor of     : Nevada Power Company and Central Telephone Company
   For             : power and communication lines
   Recorded        : November 8, 1974 in Book 473
   Document No.    : 432143, Official Records.

**PRELIMINARY REPORT**
Order No. 97125217

10. An Easement affecting a portion of said land for the purposes stated herein, and incidental purposes
    In Favor of    : Nevada Power Company and Central Telephone Company
    For            : power and communication lines
    Recorded       : March 12, 1975 in Book 501
    Document No.   : 460911, Official Records.

11. An Easement affecting a portion of said land for the purpose stated herein, and incidental purposes
    In Favor of    : Clark County Sanitation District
    For            : sewage lines
    Recorded       : April 21, 1992 in Book 920421
    Document No.   : 01076, Official Records.

12. An Easement affecting a portion of said land for the purpose stated herein, and incidental purposes
    In Favor of    : Clark County Sanitation District
    For            : sewage lines
    Recorded       : April 21, 1992 in Book 920421
    Document No.   : 01077, Official Records.

13. An Easement affecting said land and for the purposes stated herein, and incidental purposes
    In Favor of    : Clark County
    For            : perpetual avigation
    Recorded       : September 14, 1992 in Book 920914
    Document No.   : 00919, Official Records.

14. The terms, covenants, conditions and provisions as contained in an instrument, entitled "Memorandum, Department of Public works"
    Recorded       : February 7, 1995 in Book 950207
    Document No.   : 00710, Official Records.

    Addendum thereto
    Recorded       : December 8, 1995 in Book 951208
    Document No.   : 00747, Official Records.

15. The terms, covenants, conditions and provisions as contained in an instrument, entitled "Resolution of Intent to Reclassify Real Property"
    Recorded       : October 23, 1995 in Book 951023
    Document No.   : 00729, Official Records.

16. An Easement affecting said land and for the purposes stated herein, and incidental purposes
    In Favor of    : Clark County
    For            : perpetual avigation
    Recorded       : October 23, 1995 in Book 951023
    Document No.   : 00729, Official Records.

## PRELIMINARY REPORT

Order No. 9712547

17. A pending Special Assessment for the District shown below. When Notice of the assessment is recorded with the County Recorder, the assessment shall become a lien on said land.

District         : City of Las Vegas S.I.D. No. 105
Disclosed by   : Preliminary Assessment Roll
Amount         : $86,702.63
Recorded       : September 8, 1997 in Book 970908
Document No.  : 01391, Official Records.

18. The requirement that the company be provided a satisfactory Board of Directors resolution authorizing the proposed transaction and a Good Standing Certificate evidencing that the corporation known as H & M Corporation, a Nevada Corporation, is in good standing in the state of its incorporation.

19. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

20. Any facts, rights, interest of claims which are not shown by the public records, but which could be ascertained by an inspection of the land or by making inquiry of persons in possession thereof.

21. NOTE: If ALTA Extended Owners coverage is to be required, the following items will need to be satisfied prior to the close of escrow:

A. Prior to the issuance of an ALTA Owners form policy of title insurance, it shall be required that this company be furnished with an ALTA/ACSM Survey. Upon review of said survey, additional exceptions may be added showing any matters that may be disclosed by said survey.

B. An inspection will be required prior to close of escrow. Additional exceptions may be added due to any facts, rights, interests or claims which are not shown by the public records, but which may be ascertained by the inspection of said premises or by making inquiry of persons in possession thereof.

Should the inspection of the real property disclose any work of improvement in progress, Mechanic's Lien Insurance will be deleted from coverage in our policy when issued, unless prior approval to commence work has been obtained from this company.



EXHIBIT D

## Retail Suites Legend

**Retail A**

| | |
|---|---|
| Suite 100 | 1,500 sf |
| Suite 101 | 1,500 sf |
| Suite 102 | 1,500 sf |
| Suite 103 | 1,000 sf |
| Suite 104 | 2,356 sf |
| Suite 105 | n/a |
| Suite 106 | 4,000 sf |
| Common | 144 sf |
| Total | 12,000 sf |

**Retail B**

| | |
|---|---|
| Suite 100 | 3,657 sf |
| Suite 101 | 2,200 sf |
| Suite 102 | 1,500 sf |
| Suite 103 | 1,500 sf |
| Suite 104 | 3,000 sf |
| Common | 143 sf |
| Total | 12,000 sf |

**Retail C**

| | | | |
|---|---|---|---|
| Suite 100 | 1,500 sf | Suite 109 | 1,500 sf |
| Suite 101 | 1,500 sf | Suite 110 | 1,500 sf |
| Suite 102 | 1,500 sf | Suite 111 | 1,436 sf |
| Suite 103 | 1,500 sf | Suite 112 | 1,436 sf |
| Suite 104 | 1,436 sf | Suite 113 | 1,500 sf |
| Suite 105 | 1,436 sf | Suite 114 | 1,500 sf |
| Suite 106 | 1,500 sf | Suite 115 | 1,500 sf |
| Suite 107 | 1,500 sf | Suite 116 | 1,485 sf |
| Suite 108 | 1,500 sf | Common | 271 sf |
| | | Total | 25,500 sf |

ical Parking Spaces

Location Map

Vicinity Map

JR 1/21/99
1/21/99

# Colonnade Square at Pebble

istern Avenue and Pebble Road, Clark County, Nevada

Conceptual Master Development / Site Plan - Scheme V

Perlman
Architects, Inc.
2230 Corporate Circle, Suite 200
Henderson, Nevada 89014
702.898.9900 702.932.3222 fax

ORIGINAL

# FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE ("Amendment") is executed as of *24th* day of _January_, 2002 by and between Pebble Commercial Center, LLC, a Nevada limited liability company ("Lessor") and Eastgate Theatre, Inc., an Oregon corporation ("Tenant").

## RECITALS

A.     Lessor and Tenant entered into that certain Ground Lease dated as of the 5th day of November, 1997 (the "Lease") whereby Tenant agreed to lease from Lessor certain real property, which property is more particularly described in the Lease. Capitalized terms not defined herein shall have the meanings as set forth in the Lease.

B.     Landlord and Tenant desire to amend the Lease to reconfigure the Shopping Center as set forth herein.

C.     Landlord represents that the total number of automobile parking spaces of the Colonnade Square at Pebble Shopping Center will be increased by two (2) spaces pursuant to the Landlord's attached reconfiguration of the Shopping Center.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the undersigned agree as follows:

1.     Lease Exhibit A is hereby deleted in its entirety and replaced with the attached site plan and legal description depicted as Exhibit A.

2.     Lease Exhibit B is hereby deleted in its entirety and replaced with the attached site plan depicted as Exhibit B.

3.     In the event that this Amendment conflicts with the Lease, the terms of this Amendment shall control. In all other respects, the Lease, as modified by this Amendment, shall remain in full force and effect.

(Remainder of page intentionally left blank.)

IN WITNESS WHEREOF, this Amendment was executed as of the date first set forth above.

"LANDLORD"

PEBBLE COMMERCIAL CENTER, LLC
a Nevada limited liability company

By: _____

Title: _____ Manager

"TENANT"

EASTGATE THEATRE, INC, LLC
an Oregon corporation

By: _____

Name: _____ John F. Roper

Title: _____ Sr. Vice President

# Exhibit A   Legal Description of the Leased Premises



FILE M/PROJECT/005-7004/SURVEY/005-7004-REGAL-DESC_VER010402.DWG KEM 01.07.2002

**REGAL CINEMAS DESCRIPTION**

BEING A PORTION OF LOT 1 BLOCK 1 OF COLONNADE SQUARE AT PEBBLE, A COMMERCIAL SUBDIVISION, AS DEPICTED UPON THE FILED OF RECORD IN BOOK 86 PAGE 45 OF PLATS, OFFICIAL RECORDS, CLARK COUNTY, NEVADA, ALSO BEING A PORTION OF THE WEST HALF (W1/2) OF THE SOUTHWEST QUARTER (SW1/4) OF SECTION 13, T.22S., R.61E., M.D.M., CLARK COUNTY, NEVADA MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF THE AFOREMENTIONED COMMERCIAL SUBDIVISION COLONNADE SQUARE AT PEBBLE;   THENCE ALONG THE EAST LINE THEREOF S.00°24'48"W., 528.58 FEET;  THENCE ALONG THE SOUTH BOUNDARY OF SAID LOT 1 BLOCK 1, S.34°48'42"W., 109.90 FEET TO A POINT ON THE NORTH RIGHT OF WAY LINE OF PEBBLE ROAD, SAID LINE ALSO BEING THE SOUTH BOUNDARY LINE OF THE AFOREMENTIONED COMMERCIAL SUBDIVISION COLONNADE SQUARE AT PEBBLE;   THENCE ALONG SAID NORTH RIGHT OF WAY AND SOUTH BOUNDARY LINE S.89°48'45"W., 145.66 FEET;   THENCE DEPARTING SAID NORTH RIGHT OF WAY AND SOUTH BOUNDARY LINE N.00°24'46"E., 71.28 FEET;   THENCE N.90°00'00"W., 23.90 FEET;   THENCE NORTH 00°24'46" EAST, 174.90 FEET; THENCE NORTH 89°42'18" WEST, 44.20 FEET; THENCE NORTH 00°24'46" EAST, 8.32 FEET;   THENCE NORTH 89°42'18" WEST, 61.28 FEET; THENCE SOUTH 00°11'02" WEST, 126.09 FEET;   THENCE SOUTH 89°48'45" WEST, 31.36 FEET; THENCE SOUTH 00°24'46" WEST, 28.68 FEET;   THENCE SOUTH 89°48'45" WEST, 165.27 FEET;   THENCE SOUTH 00°11'15" EAST, 100.68 FEET;   THENCE SOUTH 89°42'45" WEST, 187.26 FEET;   THENCE NORTH 00°25'18" EAST, 102.19 FEET;   THENCE NORTH 89°34'42" WEST, 45.11 FEET;   THENCE NORTH 00°24'48" EAST, 84.81 FEET;   THENCE NORTH 89°34'02" WEST, 108.62 FEET;   THENCE NORTH 00°25'58" EAST, 284.14 FEET;   THENCE SOUTH 89°41'36" EAST, 496.11 FEET;   THENCE NORTH 00°04'14" EAST, 57.44 FEET;   THENCE NORTH 89°59'10" EAST, 40.03 FEET;   THENCE SOUTH 00°04'14" WEST, 141.84 FEET;   THENCE NORTH 89°37'25" EAST, 72.08 FEET;   THENCE NORTH 00°22'35" WEST, 5.13 FEET;  THENCE NORTH 89°37'25" EAST, 32.76 FEET;   THENCE NORTH 00°24'46" EAST, 174.71 FEET;   THENCE NORTH 89°37'25" EAST, 12.96 FEET;   THENCE NORTH 00°22'35" WEST, 53.67 FEET TO A POINT ON THE NORTH BOUNDARY LINE OF LOT 1 BLOCK 1 OF THE AFOREMENTIONED COMMERCIAL SUBDIVISION COLONNADE SQUARE AT PEBBLE;   THENCE ALONG SAID NORTH BOUNDARY LINE, NORTH 89°37'25" EAST, 219.45 FEET TO THE POINT OF BEGINNING.

SAID COMMERCIAL PARCEL CONTAINS 361,114 SQUARE FEET OR 8.29 ACRES MORE OR LESS AS DETERMINED BY COMPUTER METHODS.

-----

EXHIBIT A



ORION ENGINEERING AND SURVEYING, INC.
3068 E. SUNSET ROAD, SUITE E
LAS VEGAS, NEVADA 89120
(702) 739-6921

Page 1 of 2





**Exhibit A**

Site Plan of the Leased Premises

LEASED PREMISES (within broken line boundary)

## SITE INFORMATION

ZONING - Clerk County
C-2 General Commercial District

PROJECT AREA (Approximate, to be verified)

| | | |
|---|---|---|
| Gross Area | [illegible] | [illegible] acres |
| Net Area | [illegible] | [illegible] acres |

AREAS

| Retail Buildings | Area |
|---|---|
| Retail A | 12,000 gsf |
| Retail B | 12,000 gsf |
| Retail C | 25,[illegible] gsf |
| Retail - D (Pad C) | [illegible] gsf |
| Retail - E (Pad C) | [illegible] gsf |
| Retail F (Pad F) | [illegible] gsf |
| Total | 76,[illegible] gsf |

| Pads | Pad Area | Acres | Bldg Area |
|---|---|---|---|
| Pad A | 32,[illegible] sf | [illegible] | [illegible] gsf |
| Pad B | [illegible] sf | [illegible] | [illegible] gsf |
| Pad C | n/a | | n/a |
| Pad D | [illegible] sf | [illegible] | [illegible] gsf |
| Pad E | [illegible] sf | [illegible] | [illegible] gsf |
| Pad F | n/a | | n/a |
| Pad G | [illegible] sf | [illegible] | [illegible] gsf |
| Total Pads | [illegible] sf | [illegible] | [illegible] gsf |

| | |
|---|---|
| Total Retail & Pad Buildings | [illegible] gsf |
| Theater Building | Area |
| Theater - gsf | [illegible] gsf |
| Total All Buildings | 179,[illegible] gsf |
| F A R (net [illegible] sf) | [illegible] |

PARKING REQUIREMENTS

Total Overall Site

Code Required

[illegible]

Total Required [illegible] spaces

| | |
|---|---|
| Theater | [illegible] spaces |
| Retail A-B-C | [illegible] spaces |
| Retail D-E-F | [illegible] spaces |
| Pads A-B-D-E-G | [illegible] spaces |
| Total Provided | [illegible] spaces |

Ratio Provided [illegible]

Note

[illegible]

Vicinity Map

Location Map

Page 2 of 2

# Colonnade Square at Pebble

Triple Five Nevada Development Corporation
Las Vegas, Nevada 702-242-6937

North
Scale: 1" = 40'

Perlman

Eastern Avenue and Pebble Road, Las Vegas, Nevada

Master Site Plan

Exhibit B Site Plan for the Eastern/Pebble Center

**SITE INFORMATION**

ZONING - Clark County

PROJECT AREA (Approximate, to be verified)

AREAS

PARKING REQUIREMENTS

Note

Vicinity Map

Location Map

# Colonnade Square at Pebble

Eastern Avenue and Pebble Road, Las Vegas, Nevada

Triple Five Nevada Development Corporation
Las Vegas, Nevada 702-242-6937

Master Site Plan

North Scale 1" = 40'

Perlman

Page 1 of 1

# TRIPLE FIVE NEVADA DEVELOPMENT CORPORATION

9510 W. SAHARA AVENUE, SUITE 200
LAS VEGAS, NEVADA 89117

TELEPHONE (702) 242-6937                                        FACSIMILE (702) 242-6941

August 20, 2003

**VIA FACSIMILE**

Robert G. Crane
Vice President, Real Estate
Regal Entertainment Group
7132 Regal Lane
Knoxville, Tennessee 37918

> Re:     *Regal Cinemas – Las Vegas, Nevada*
>         *Colonnade Square at Pebble and Village Square at Peccole Ranch*

Dear Mr. Crane:

Enclosed please find for your review copies of the following documents:

1. First Amendment to Lease by and between Village Square, LLC, a Nevada limited liability company, as successor in interest to Triple Five Development Group Central, Ltd., a Minnesota corporation, and Eastgate Theatre, Inc., an Oregon corporation ("Village Square Amendment"); and

2. Second Amendment to Lease by and between Pebble Commercial Center, LLC, a Nevada limited liability company and Eastgate Theatre, Inc., an Oregon corporation ("Colonnade Amendment").

Please note there are two (2) Site Plans depicting the turnabout and a new legal description for the Leased Property excluding the area for the fountain and new buildings. Along with the new legal description an acreage estimate will be provided for the Leased Property to insert into the Colonnade Amendment. I will e-mail the exhibits to you for your review.

. . . . . .

N:\colonnade\Act3\corr\crane enc.ltr.doc

Robert G. Crane
August 20, 2003
Page 2 of 2

If you have any questions, please do not hesitate to contact me.  Thank you.

Sincerely,

John M. McCall
Corporate Counsel

JMM/sa
Enclosures

## SECOND AMENDMENT TO LEASE

THIS SECOND AMENDMENT TO LEASE ("Second Amendment") is made and entered into as of the ____ day of May, 2004, by and between PEBBLE COMMERCIAL CENTER, LLC, a Nevada limited liability company ("Lessor"), and EASTGATE THEATRE, INC., an Oregon corporation ("Tenant").

### RECITALS

A.     Lessor and Tenant entered into that certain Ground Lease dated as of November 5, 1997, as amended by that certain First Amendment to Lease dated as of January 24, 2002 (as amended and supplemented, the "Lease"), pursuant to which Lessor leased to Tenant, and Tenant leased from Lessor, certain Leased Premises located in the Colonnade Square at Pebble Shopping Center in Las Vegas, Nevada. The Lease has been supplemented by a Memorandum of Ground Lease dated January 2000, recorded in Book 20010716 as Instrument No. 2060 with the Clark County, Nevada Recorder on July 16, 2001; a Tenant Estoppel Certificate dated January 21, 2000; a Tenant Estoppel Certificate dated October 24, 2001; a Landlord's Estoppel Certificate, Waiver and Consent dated January 24, 2002; a Leasehold Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture filing dated January 29, 2002; and a Tenant Estoppel Certificate dated September 3, 2002.

B.     On October 11, 2001, Tenant filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Pursuant to Tenant's Amended Joint Plan of Reorganization, Tenant assumed the Lease. On November 21, 2001, Lessor filed a Proof of Claim in connection with Tenant's cure obligations associated with Tenant's assumption of the Lease, specifically, Tenant's obligations regarding Common Area Expense (as hereinafter defined).

C.     On July 31, 2003, Tenant and Lessor entered into a Stipulation resolving Lessor's bankruptcy claim. The Stipulation was filed with the United States Bankruptcy Court, Middle District of Tennessee, Nashville Division, on August 5, 2003. As confirmed in the Stipulation, Tenant has paid-in-full all of its obligations under the Lease through July 31, 2002, and Lessor has no claim for any Common Area Expense through July 31, 2002.

D.     Lessor and Tenant are hereby agreeing to reconfigure the Shopping Center to accommodate Lessor's plans to construct one or two buildings and a fountain in the Shopping Center and a customer drop-off and turnabout lane in front of Tenant's Building.

E.     Lessor and Tenant desire to further amend the Lease as set forth herein to provide a fixed sum payable by Tenant for Common Area Expense and in order to provide for the reconfiguration of the Shopping Center.

NOW, THEREFORE, in consideration of the payments to be made pursuant to this Second Amendment, the Recitals set forth above which are hereby incorporated into this Second Amendment by reference, and other good and valuable consideration, the receipt and

sufficiency of which are hereby acknowledged, the parties hereto state, confirm and agree as follows:

### AMENDMENT

1.    All initial capitalized terms used herein shall have the meanings ascribed thereto in the Lease unless otherwise specifically defined herein.

2.    The first sentence of <u>Section 1</u> is hereby deleted in its entirety and replaced with the following:

> "Upon the terms and conditions contained in the Lease, Lessor leases to Tenant, and Tenant leases from Lessor, that certain real property located in Clark County, Nevada, as legally described in Exhibit "A" attached hereto and incorporated herein by reference, and depicted on the site plan attached hereto as Exhibit "B" (the "Site Plan"), and incorporated herein by reference, together with the access rights and cross-parking privileges described below and all other rights, privileges and easements appurtenant thereto (hereinafter referred to as the "Leased Premises")."

3.    The following language is hereby added to the end of Section 1:

> "The multi-screen theatre building constructed on the Leased Premises pursuant to Section 10 of the Lease, including, without limitation, the decorative metal work attached to the theater building, is hereby designated as "Tenant's Building." Tenant hereby consents to the existence, construction, installation and general location of a fountain and one or two retail buildings totaling approximately 11,000 square feet as depicted on the Site Plan. Lessor shall also install, at its sole cost and expense and pursuant to mutually approved plans, a customer drop-off and turnabout lane in front of Tenant's Building and depicted on Exhibit "E" attached hereto and incorporated herein by reference."

4.    The following language shall be added after Section 4.3:

> "4.3.1 *Lessor's Obligation to Maintain the Common Area.* The "Common Area" means all areas, facilities and improvements owned, operated or provided by Lessor within the Shopping Center from time to time for the non-exclusive common use or benefit of all occupants and tenants of the Shopping Center and shall expressly include all areas of the Leased Premises other than Tenant's Building. The Common Area includes, without limitation, all parking areas, driveways, walkways, sidewalks, curbs, directional signs, landscaped areas, open space areas, fountains, sculptures, public restrooms, drainage and drainage

retention systems, irrigation systems, utility systems and lighting systems typically provided to first class shopping centers, to the extent such are owned, operated or provided by Lessor. Notwithstanding anything in this Lease to the contrary, including without limitation the provisions of Section 9, Lessor agrees to repair, maintain and operate, or cause to be repaired, maintained and operated, the Common Area in a good, safe and orderly condition and in a manner consistent with a first-class shopping center, including providing security and utility services to the Common Area. Lessor and Tenant expressly agree that Lessor's obligations as to the Common Area expressly include those portions of the Common Area located on the Leased Premises. As provided in Sections 4.3.2 and 4.3.3, Tenant shall reimburse to Lessor a fixed portion of the costs expended by Lessor pursuant to Lessor's responsibilities with respect to the Common Area ("Common Area Expense").

4.3.2 *Past Common Area Expense.* Notwithstanding anything in the Lease or this Second Amendment to the contrary, for the period between August 1, 2002, and July 31, 2003, Tenant shall pay to Lessor as Common Area Expense the annual sum of One and 65/100ths Dollars ($1.65) per square foot of Tenant's Building as Tenant's sole obligation for Common Area Expense. Since the square footage of Tenant's Building is deemed to be 65,487 square feet (as hereinafter provided), Common Area Expense for the stated period is $108,053.55. Lessor and Tenant will jointly determine the amount actually paid by Tenant for Common Area Expense for the period between August 1, 2002, and July 31, 2003. In the event Tenant paid more than $108,053.55 for the period between August 1, 2002, and July 31, 2003, Tenant shall not be entitled to any credit or payment of any kind from Lessor. In the event Tenant paid less than $108,053.55 for Common Area Expense for the period between August 1, 2002, through July 31, 2003, Tenant shall, within thirty (30) days' notice from Lessor, pay the difference between $108,053.55 and the amount Tenant actually paid for that time period .

4.3.3 *Ongoing Common Area Expense.* Commencing August 1, 2003, and continuing through the remainder of the Lease Term (including any Renewal Terms), Tenant shall pay to Lessor on the first day of each month, as additional rent, one twelfth (1/12th) of the Common Area Expense in the annual sum of One and 65/100ths Dollars ($1.65) per square foot of Tenant's Building as Tenant's sole obligation for Common Area Expense. Such annual amount shall be increased on August 1, 2005, and every August 1st thereafter for each year of the Lease Term, including any Renewal Term, by the lesser of 3% or the percentage increase, if any, of the

Consumer Price Index for West Urban Wage Earners and Clerical Workers for all items (1982-84=100), published by the Bureau of Labor Statistics of the U.S. Department of Labor ("CPI"), which increase in the CPI shall be calculated based on the increase in the CPI from the June of the immediately preceding year to the CPI from the June immediately preceding the month in which such adjustment is to be effective. Such annual amount shall never be decreased. Tenant shall continue to directly pay all taxes attributable to the Leased Premises pursuant to Section 7.1, including, but not limited to, special improvement district assessments. Tenant shall continue to directly pay insurance for the Leased Premises pursuant to Section 7.2. Tenant shall continue to directly pay for all utilities attributable to Tenant's Building pursuant to Section 8 (as amended). Lessor shall, at its sole cost and expense, pay all association dues attributable to the Leased Premises when due.

#### 4.3.4 *Square Footage of Tenant's Building.*

Tenant's Building is deemed to be 65,487 square feet, and Lessor and Tenant agree that Tenant's Common Area Expense payments shall be based on 65,487 square feet."

5.    Effective as of August 1, 2002, the last paragraph of Section 7.1 of the Lease is hereby deleted, and Tenant's sole obligation under Section 9.1 of the Lease shall be to maintain and repair Tenant's Building.

6.    Section 8 is hereby amended by deleting the phrase "the Leased Premises" and substituting the phrase "Tenant's Building."

7.    Lease Exhibit "A" as previously amended by the First Amendment to Lease is hereby deleted in its entirety and replaced with the addendum attached to this Second Amendment as Exhibit "A".

8.    Lease Exhibit "B" as previously amended by the First Amendment to Lease is hereby deleted in its entirety and replaced with the addendum attached to this Second Amendment as Exhibit "B".

9.    The addendum attached to this Second Amendment as Exhibit "E" is hereby inserted to the Lease as Exhibit "E".

10.    To Tenant's actual knowledge, all utility systems originally installed by Tenant and located on the Leased Premises but outside of Tenant's Building are in good working order as of the date hereof.

11.    Lessor and Tenant agree that this Second Amendment results in the Leased Premises being reconfigured and reduced in size. Lessor shall perform a lot line adjustment on the Leased Premises so that the acreage and boundaries of the Leased Premises can be

definitively determined.  Lessor shall arrange for the Leased Premises to be reassessed based on the lot line adjustment and Tenant's tax obligation under Section 7.1 of the Lease shall refer only to the reconfigured Leased Premises.

12.    Except as expressly modified by this Second Amendment, the Lease shall remain in full force and effect.

IN WITNESS WHEREOF, the parties hereto have executed this Second Amendment as of the day and year first above written.


**LESSOR**

Pebble Commercial Center, LLC,
a Nevada limited liability company


By: John McCall, its Manger

**TENANT**

Eastgate Theatre, Inc.,
an Oregon corporation


By: _John F Roper_
(Printed Name)


Its: _Vice President_
(Printed Title)


......

EXHIBIT "A"

(See Attached)

04/30/04    08:40    TR   ⌐ 5 NEV DEV CORP → 3838845                    NO.157   ᴅ02



CONSULTING ENGINEERS ▪ PLANNERS ▪ SURVEYORS
2727 SOUTH RAINBOW BOULEVARD
LAS VEGAS, NEVADA 89146-5148

W.O. 6411
APRIL 01, 2004
BY: TZ
P.R. BY: TJ
PAGE 1 OF 2

**EXPLANATION:**
THIS LEGAL DESCRIBES A PARCEL OF LAND GENERALLY LOCATED NORTHEASTERLY OF EASTERN AVENUE AND PEBBLE ROAD.

### LEGAL DESCRIPTION

SITUATE IN THE WEST HALF (W1/2) OF THE SOUTHWEST QUARTER (SW 1/4) OF SECTION 13, TOWNSHIP 22 SOUTH, RANGE 61 EAST, M.D.M., CLARK COUNTY, NEVADA, BEING A PORTION OF LOT 1 OF COLONNADE SQUARE AT PEBBLE, A COMMERCIAL SUBDIVISION SHOWN IN BOOK 86 OF PLATS, PAGE 45, OFFICIAL RECORDS, CLARK COUNTY, NEVADA, MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF SAID LOT 1 OF COLONNADE SQUARE AT PEBBLE; THENCE ALONG THE NORTH PROPERTY LINE THEREOF SOUTH 89°37'25" WEST, 219.44 FEET; THENCE SOUTH 00°22'35" EAST DEPARTING SAID NORTH LINE, 53.66 FEET; THENCE SOUTH 89°37'25" WEST, 12.96 FEET; THENCE SOUTH 00°24'48" WEST, 174.71 FEET; THENCE SOUTH 89°37'25" WEST, 32.76 FEET; THENCE SOUTH 00°22'35" EAST, 5.13 FEET; THENCE SOUTH 89°37'25" WEST, 72.08 FEET; THENCE NORTH 00°04'14" EAST, 233.49 FEET RETURNING TO SAID NORTH LINE; THENCE SOUTH 89°37'25" WEST ALONG SAID NORTH LINE, 115.00 FEET; THENCE SOUTH 00°04'14" WEST DEPARTING SAID NORTH LINE, 147.94 FEET; THENCE NORTH 89°41'36" WEST, 421.14 FEET; THENCE SOUTH 00°25'58" WEST, 163.49 FEET; THENCE SOUTH 89°35'04" EAST, 108.58 FEET; THENCE SOUTH 00°24' 48" WEST, 207.47 FEET; THENCE NORTH 89°48'45" EAST, 358.05 FEET; THENCE SOUTH 00°11'02" WEST, 100.69 FEET TO THE NORTHERLY RIGHT-OF-WAY OF PEBBLE ROAD; THENCE NORTH 89°48'45" EAST ALONG SAID NORTHERLY RIGHT-OF-WAY, 70.00 FEET; THENCE NORTH 00°11'02" EAST, DEPARTING SAID NORTHERLY RIGHT-OF-WAY, 255.46 FEET; THENCE SOUTH 89°42'18" EAST, 61.28 FEET; THENCE SOUTH 00°24'48" WEST, 8.32 FEET; THENCE SOUTH 89°42'18" EAST, 44.20 FEET; THENCE SOUTH 00°24'48" WEST, 174.90 FEET; THENCE NORTH 90°00'00" EAST, 23.90 FEET; THENCE SOUTH 00°24'48" WEST, 71.28 FEET RETURNING TO SAID NORTHERLY RIGHT-OF-WAY; THENCE NORTH 89°48'45" EAST ALONG SAID NORTHERLY RIGHT-OF-WAY, 145.66 FEET; THENCE NORTH 34°48'42" EAST DEPARTING SAID NORTHERLY RIGHT-OF-WAY, 109.90 FEET TO THE EAST PROPERTY LINE OF SAID COLONNADE SQUARE; THENCE ALONG SAID EAST PROPERTY LINE NORTH 00°24'48" EAST, 528.58 FEET TO THE POINT OF BEGINNING.

CONTAINS 8.08 ACRES, MORE OR LESS.

LEGAL DESCRIPTION CONTINUED
W.O. 6411
APRIL 01, 2004
PAGE 2 OF 2

THIS LEGAL DESCRIPTION IS PROVIDED AS A CONVENIENCE AND IS NOT INTENDED
FOR THE PURPOSE OF SUBDIVIDING LAND NOT IN CONFORMANCE WITH THE NEVADA
REVISED STATUTES.

END OF DESCRIPTION.

G:\5923\LEGALS\REVPARCELG.DOC



04/30/04 08:40 TRIPLE 5 NEV DEV CORP → 3938845 NO.157 004

| | | |
|---|---|---|
| VTN nevada | EXHIBIT TO ACCOMPANY LEGAL DESCRIPTION | W.O.#: 6411<br>DATE: 04/01/04<br>BY: TZ<br>SCALE: NONE<br>SHEET 1 OF 1 |

Exhibit "B"

The Site Plan

(See Attached)

......



04/30/04 08:40 TK :5 NEV DEV CORP → 3838845 NO.157 D05

## SITE INFORMATION

[illegible]

B

# Colonnade Square at Pebble

Triple Five Nevada Development Corporation
Las Vegas, Nevada 702-242-6937

Perlman

eastern Avenue and Pebble Road, Clark County, Nevada

Regal Site Plan



## SITE INFORMATION

**ZONING - Clark County**
C-3 General Commercial District

**PROJECT AREA (Approximate, to be verified)**

| | | |
|---|---|---|
| Gross Area | [illegible] sf | 20.34 acres |
| Net Area | 780,832 sf | 17.93 acres |

**AREAS**

| Retail Buildings | Area |
|---|---|
| Retail - A | 12,000 gsf |
| Retail - B | 12,000 gsf |
| Retail - C | 25,500 gsf |
| Retail - D (Pad C) | 6,960 gsf |
| Retail - E (Pad C) | 6,000 gsf |
| Retail - F (Pad F) | 13,638 gsf |
| Total | 76,098 gsf |

| Pads | Pad Area | Acres | Bldg Area |
|---|---|---|---|
| Pad A | 34,349 sf | 0.79 | 9,340 gsf |
| Pad B | 30,055 sf | 0.69 | 3,950 gsf |
| Pad C | n/a | | n/a |
| Pad D | 23,833 sf | 0.54 | 6,125 gsf |
| Pad E | 30,332 sf | 0.70 | 4,922 gsf |
| Pad F | n/a | | n/a |
| Pad G | 21,482 sf | 0.49 | 3,203 gsf |
| Total Pads | 134,482 sf | 3.54 | 26,540 gsf |

| | |
|---|---|
| Total Retail & Pad Buildings | 102,638 gsf |

| Theater Building | Area |
|---|---|
| Theater - gsf | 78,784 gsf |
| Total All Buildings | 181,422 gsf |

| | |
|---|---|
| F.A.R. (net 780,832 sf) | 0.232 |

**PARKING REQUIREMENTS**

Total Overall Site
Code Required:

| | | |
|---|---|---|
| 5.5 per 1000 (1st 100k sf) | 100 x 5.5 = | 550 spaces |
| 4 per 1000 (remaining sf) | 81.4 x 4 = | 326 spaces |
| Total Required | | 876 spaces |
| Total Provided | | 1,236 spaces |
| Ratio Provided | 1 per 146 sf | 6.7 per 1000 sf |

B

# Colonnade Square at Pebble

Eastern Avenue and Pebble Road, Clark County, Nevada

Triple Five Nevada Development Corporation
Las Vegas, Nevada 702-242-6937

Regal Site Plan

North
Scale: 1" = 40'
0 40 80

Date: April 27, 2004
Project Number: [illegible]

Perlman Architects

Exhibit "E"

(See Attached)



05/03/04 08:18 TR . 5 NEV DEV CORP → 3838845 NO.159 D02

# Exhibit "E"

# Colonnade Square at Pebble

Triple Five Nevada Development Corporation
Las Vegas, Nevada 702-242-6937

B

astern Avenue and Pebble Road, Clark County, Nevada

Regal Site Plan

Perlman

# EXHIBIT "2"

# EXHIBIT "2"

**Subject:** RE: Regal Theater
**Date:** Monday, August 17, 2020 at 4:46:15 PM Eastern Daylight Time
**From:** Maura Fry
**To:** Justin Blomberg
**CC:** Susan Cotton
**Attachments:** image001.jpg

Justin –

Are you available to discuss some time tomorrow?

Maura
865.925.9882

**From:** Justin Blomberg <justin@quarrycapital.net>
**Sent:** Monday, August 17, 2020 12:33 PM
**To:** Maura Fry <Maura.Fry@regalcinemas.com>
**Cc:** Susan Cotton <SusanC@sunpm.net>
**Subject:** Re: Regal Theater

**Warning: This email originated from outside Regal Entertainment Group email system. DO NOT CLICK LINKS or ATTACHMENTS in this email unless you recognize the sender and know the content is safe.**

Maura

Attached please find a copy of the notice that was sent last week.

We really need Regal to honor its contractual commitments to pay rent.

Our lender is not allowing any deferment of payments.

Regards

Justin Blomberg
Cell  (734) 634-6988

**From:** Maura Fry <Maura.Fry@regalcinemas.com>
**Date:** Monday, August 17, 2020 at 12:25 PM
**To:** Justin Blomberg <justin@quarrycapital.net>
**Cc:** Susan Cotton <SusanC@sunpm.net>

**Subject:** RE: Regal Theater

Justin –

Thank you for your time last week. As I mentioned on the phone, we have been shut down nationwide for the last 5 months, that means we've had zero revenue. We are hoping to reopen this Friday (8/21/20) but 1) we need to agree to a deferral/repayment plan and 2) we will be restricted on the number of seats we can sell (as well as many other things). The film slate for the balance of the year will be thin. This will not be a 'normal' film year by any means. The studios are still reluctant to release films, Disney is sending *Mulan* straight to streaming and bypassing the theaters altogether. Top Gun II was slated for release in Dec 2020 but has been pushed to June 2021. Currently we have 2 films for September, *Tenet* and *The King's Man*. In October we'll have *Wonder Woman*, in November (the beginning of peak season) we'll have *Black Widow* and *No Time to Die*. That is **IF** *Tenet* does well. Typically, we have a couple new films each weekend. I say all of this to demonstrate that our re-opening doesn't relieve us of our challenges and post-opening we will still need your help. Below is my proposal, please let me know if you would like to discuss further.

1. Defer all costs (Rent/CAM/RE Taxes, etc.) April thru September
2. Effective October 1, 2020 – pay 15% of total revenue as Gross Rent in lieu of Base Rent, CAM, and RE Taxes – for the balance of 2020
3. Effective January 1, 2021 resume regular payments per the existing lease
4. Beginning May 1, 2021 begin repayment of 50% of the deferred costs, over 36 months
5. Extend the lease term 1 year

Thank you and I look forward to hearing from you soon.

Maura
865.925.9882

**From:** Justin Blomberg <justin@quarrycapital.net>
**Sent:** Monday, August 10, 2020 2:22 PM
**To:** Maura Fry <Maura.Fry@regalcinemas.com>
**Cc:** Susan Cotton <SusanC@sunpm.net>
**Subject:** Re: Regal Theater

**Warning: This email originated from outside Regal Entertainment Group email system. DO NOT CLICK LINKS or ATTACHMENTS in this email unless you recognize the sender and know the content is safe.**

Ok- I am available now

Call me on my cell  (734) 634-6988

**From:** Maura Fry <Maura.Fry@regalcinemas.com>

# EXHIBIT "3"

# EXHIBIT "3"



JEFFREY R. ALBREGTS                                    NSB No. 0066
Jeffrey R. Albregts, LLC
701 Shadow Lane, Suite 150
Las Vegas, NV 89106
(702) 483-5026

October 14, 2020

Ms. Maura L. Fry
Director of Real Estate
Regal Entertainment Group
Via email: Maura.Fry@regalcinemas.com

    Re:    Regal Theater Eastgate Lease:
             Tenant:  Eastgate Theater, Inc.
             Landlord:  Pebble Commercial Center, LLC

Dear Ms. Fry:

This letter is in reference to the above Lease (and the two Amendments to the same), and your recent email chain with Justin Blomberg regarding as much. This office represents the above Landlord for purposes of this letter.

After reviewing your Company's compromise offer in your email to Mr. Blomberg dated August 28, 2020, we agree to compromise here in the order presented by you in that email:

1. Accepted (deferring all leasehold costs April through September, which has already occurred).

2. Accepted, but your Company has stopped operating since then. So, some estimated sum will have to be agreed to quickly by your side here and paid forthwith as well.

3. Accepted, i.e., resume full lease payments on January 1, 2021.

4. Accepted, meaning reimbursement of all deferred costs paid over 36 months commencing May 1, 2021, at a rate of 50% each month until paid in full.

5. Accepted, subject to fulfillment of the above four "accepted" items.

If you can or will no longer agree to as much here, we will proceed with noticing and filing for eviction now. Given current circumstances and the applicable state government Directives here, including that all rent moratoriums are now extinguished in Nevada as of October 15, 2020, we reserve the right to use your email string with Mr. Blomberg and this letter to evidence to the Court our good faith efforts to resolve these contractual issues amicably or short of eviction and/or legal proceedings. In short, your Company's continued refusal to pay the rent currently due to

Ms. Maura Fry, Director of Real Estate
Regal Entertainment Group
October 14, 2020

Pebble Commercial Center, LLC, pursuant to your Company's Lease with it is unacceptable and, if need be, we will commence legal and eviction proceedings to address as much now.

Please therefore respond to this letter/email with your acceptance of these terms, as you previously offered to do, along with your October payment on or before October 19, 2020, or we may commence (end of next week) with noticing your Company's eviction here, as well as any other related legal proceedings, pursuant to Sections 12 and 14 of your Company's Lease.

Very truly yours,

JEFFREY R. ALBREGTS, LLC

Jeffrey R. Albregts, Esq.

JRA/hls

cc:  Mr. Justin Blomberg
     Mr. Greg Horn

# EXHIBIT "4"

# EXHIBIT "4"

## SEVEN-DAY NOTICE TO PAY RENT OR QUIT
### (NRS 40.253)

TO: Eastgate Theatre, Inc.
_____
*Tenant(s) Name(s)*

■ and all occupants   ☐ named tenant(s) only

8880 South Eastern Avenue
_____
*Address*
Las Vegas, Nevada  89123
_____
*City, State, Zip Code*

FROM: Pebble Commercial Center, LLC/Regal I, LLC
_____
*Landlord's Name*

1370 Jet Stream Drive, Suite 100
_____
*Address*
Henderson, Nevada  89052
_____
*City, State, Zip Code*
(702) 483-5026
_____
*Telephone Number*

DATE OF SERVICE: *Mailing  11-10-20*   *Posting : 11-10-20*

**TENANTS ARE ADVISED THAT THE LAS VEGAS JUSTICE COURT HAS INFORMATION
ON ITS WEBSITE CONCERNING THE AVAILABILITY OF MEDIATION,
GOVERNMENT-SPONSORED RENTAL ASSISTANCE, AND ELECTRONIC FILING FOR
THE TENANT AFFIDAVIT, AMONG OTHER MATTERS.
A TENANT MAY ACCESS THIS INFORMATION AT: http://lasvegasjusticecourt.us/**

PLEASE TAKE NOTICE that you are in default in payment of rent for the above-described premises.

You are in default for the period *(insert beginning date covered by rent due)* April 1, 2020  to
*(insert ending date covered by rent due)* Nov. 10, 2020  .

The amount of periodic rent is *(rent may include recurring periodic utilities)*: $71,048.94

The last date any amount of rent was paid was *(insert date of last rent payment)* March 5, 2020
in the amount of *(amount of last rent payment made)* $71,048.94  .

Current rent due: *(amount of rent due for the current period)*        $71,048.94
Past due rent: *(rent due for previous periods)*                         $537,660.68
Late fees: *(cannot be in excess of 5% of the periodic rent)*            $
Total owed: *(the rent owed plus late fees owed)*                        $608,709.62

Your failure to pay rent or vacate the premises before the close of business on the seventh (7th) judicial day[1] following the Date of Service of this notice may result in your landlord applying to the Justice Court for an eviction order. If the court determines that you are guilty of an unlawful detainer, the court may issue a summary order for your removal or an order providing for your nonadmittance, directing the sheriff or constable to post the order in a conspicuous place on the premises not later than 24 hours after the order is received by the sheriff or constable. The sheriff or constable shall then remove you not earlier than 24 hours but not later than 36 hours after the posting of the order. Pursuant to NRS 118A.390, you may seek relief if a landlord unlawfully removes you from the premises, or excludes you by blocking or attempting to block your entry upon the premises, or willfully interrupts or causes or permits the interruption of an essential service required by the rental agreement or chapter 118A of the Nevada Revised Statutes.

**YOU ARE HEREBY ADVISED OF YOUR RIGHT TO CONTEST THIS NOTICE** by filing an Affidavit no later than by the close of business[2] on the seventh (7th) judicial day following the Date of Service of this notice, with the Justice Court for the city of Las Vegas, stating that you have tendered payment or are not in default of rent. You can fill out the forms and file electronically at https://nevada.tylerhost.net/SRL/srl/ (choose "SUMMARY EVICTION: Tenant's Answer"). If you do not have internet access, you can file your forms in-person at the Las Vegas Justice Court is located at 200 Lewis Avenue, Las Vegas, NV 89155.

YOU CAN OBTAIN AN AFFIDAVIT FORM AND INFORMATION at the Civil Law Self-Help Center, located at the Regional Justice Center, downtown Las Vegas, or on its website, www.CivilLawSelfHelpCenter.org.

---

[1] Judicial days do not include the date of service, Fridays, Saturdays, Sundays, or certain legal holidays.
[2] Las Vegas Justice Court closes at 5:30 p.m. on Mondays through Thursdays.

© 2020 – Civil Law Self-Help Center, Rev. 10/8/20



**DECLARATION OF SERVICE**
**OF SEVEN-DAY NOTICE TO PAY RENT OR QUIT**

On *(insert date of service)* _____11/10/20_____, I served a Seven-Day Notice to Pay
Rent or Quit to the following address in the following manner:

*(street address where you served )* ___8880 South Eastern Avenue___

*(city, state, zip where you served)* ___Las Vegas NV 89123___

*(check only one)*

☐ By delivering a copy to the tenant(s) personally.

☐ Because the tenant(s) was absent from tenant's place of residence, by leaving a copy with (insert
name or physical description of person served) _____,
a person of suitable age and discretion, AND by mailing a copy to the tenant(s) at tenant's place of
residence.

☑ Because neither tenant nor a person of suitable age or discretion could be found there, by posting a
copy in a conspicuous place on the property, AND mailing a copy to the tenant(s) at the place where
the property is situated.

I declare under penalty of perjury under the laws of the State of Nevada that the foregoing is true and
correct.

___11/10/20___     ___Francine Gray___     _____     ___Francine Gray___
*(Date)*                *(Server's Name)*              *(Server's Badge/License #)[1]*        *(Server's Signature)*

---

[1] A server who does not have a badge or license number may be an agent of an attorney licensed in Nevada. Notices served by agents must also include an
attorney declaration as proof of service.

# EXHIBIT "5"

# EXHIBIT "5"

**Subject:** RE: REG - Colonnade
**Date:** Thursday, November 12, 2020 at 9:07:58 AM Eastern Standard Time
**From:** Maura Fry
**To:** Justin Blomberg

Justin –

Please see the proposal below and let me know when is convenient to discuss.

- Defer all costs (Rent/CAM/RE Taxes, etc.) April thru December
- Effective January 1, 2021 thru May 31, 2021 – pay the greater of $7,000 or 15% of total revenue as Gross Rent in lieu of Base Rent, CAM, and RE Taxes each month
- June 1, 2021 resume regular payments per the existing lease
- August 1, 2021 begin repayment of 50% of the deferred costs, over 36 months
- Extend the lease term 1 year

Thank you,

Maura
865.925.9882

**From:** Justin Blomberg <justin@quarrycapital.net>
**Sent:** Wednesday, November 11, 2020 6:17 PM
**To:** Maura Fry <Maura.Fry@regalcinemas.com>
**Subject:** Re: REG - Colonnade

Maura

Please e-mail to me your proposal and then we can discuss

Thanks

Justin

**From:** Maura Fry <Maura.Fry@regalcinemas.com>
**Date:** Wednesday, November 11, 2020 at 5:14 PM
**To:** Justin Blomberg <justin@quarrycapital.net>
**Subject:** REG - Colonnade

Justin –

Are you available for a call tomorrow morning? Maybe 10:00a EST (I think you are in FL, right). I will have a proposal for you.

Thank you,

Maura L. Fry
Director of Real Estate
Regal Entertainment Group
865.925.9882

Maura:

Your proposed terms go far beyond any payment arrangement that Landlord has made with any other tenant, and are unacceptable. Given the vast differences between this and what has been previously proposed, we intend to move forward with the notice we served and posted earlier this week and to which you responded here today.

Regards,

Justin Blomberg
Cell  (734) 634-6988

**From:** Maura Fry <Maura.Fry@regalcinemas.com>
**Date:** Thursday, November 12, 2020 at 9:08 AM
**To:** Justin Blomberg <justin@quarrycapital.net>
**Subject:** RE: REG - Colonnade

Justin –

Please see the proposal below and let me know when is convenient to discuss.

1. Defer all costs (Rent/CAM/RE Taxes, etc.) April thru December
2. Effective January 1, 2021 thru May 31, 2021 – pay the greater of $7,000 or 15% of total revenue as Gross Rent in lieu of Base Rent, CAM, and RE Taxes each month
3. June 1, 2021 resume regular payments per the existing lease
4. August 1, 2021 begin repayment of 50% of the deferred costs, over 36 months
5. Extend the lease term 1 year

Thank you,

Maura
865.925.9882

**From:** Justin Blomberg <justin@quarrycapital.net>
**Sent:** Wednesday, November 11, 2020 6:17 PM
**To:** Maura Fry <Maura.Fry@regalcinemas.com>
**Subject:** Re: REG - Colonnade

Maura

Please e-mail to me your proposal and then we can discuss

Thanks

Justin

**Subject:** Re: REG - Colonnade
**Date:** Monday, November 16, 2020 at 8:47:26 AM Eastern Standard Time
**From:** Maura Fry
**To:** Justin Blomberg

I will all you then. Thank you.

Thanks,
Maura

**From:** Justin Blomberg <justin@quarrycapital.net>
**Sent:** Monday, November 16, 2020 8:46:28 AM
**To:** Maura Fry <Maura.Fry@regalcinemas.com>
**Subject:** Re: REG - Colonnade

Maura

I am free at 1pm eastern today.

Regards

Justin Blomberg
Cell  (734) 634-6988

**From:** Maura Fry <Maura.Fry@regalcinemas.com>
**Date:** Monday, November 16, 2020 at 8:30 AM
**To:** Justin Blomberg <justin@quarrycapital.net>
**Subject:** Re: REG - Colonnade

Justin-

Are you available to discuss today?

Thanks,
Maura

**From:** Justin Blomberg <justin@quarrycapital.net>
**Sent:** Thursday, November 12, 2020 6:54:11 PM
**To:** Maura Fry <Maura.Fry@regalcinemas.com>
**Subject:** Re: REG - Colonnade

# EXHIBIT "6"

# EXHIBIT "6"

Las Vegas Justice Court
Electronically Filed
2/16/2021 7:43 AM
Melissa Saragosa
CLERK OF THE COURT

## JUSTICE COURT, LAS VEGAS TOWNSHIP

## CLARK COUNTY, NEVADA

PEBBLE COMMERCIAL CENTER LLC,
REGAL I LLC,

        Landlord(s),

vs.

EASTGATE THEATRE INC.,

        Tenant(s).

CASE NO.:  20E013675

DEPT. NO.:  JC Civil Evictions

**ORDER**

This matter came before the court for a summary eviction hearing based upon Landlord's 7-Day Notice to Pay Rent or Quit ("POQ Notice").  The court heard argument and received documentation at hearing, and announced it would take the matter under advisement.

**DISCUSSION**

This matter involves a ground lease whereby Landlord leased 8.5 acres of land to Tenant who constructed, and has operated thereon, a multiplex movie theater.  The lease is for an initial 25-year term, with four 5-year renewal options, which, if exercised, could provide for 45 years of tenancy.

It is undisputed that rent has not been paid since April, 2020.  Tenant however argues that summary eviction should not be granted on the following bases: (1) payment is excused due to the effects of the COVID-19 pandemic, and (2) at stake in this case is more than simple occupancy, rather, this case involves the multi-million dollar Tenant improvement costs associated with construction of the theater complex. Tenant argues that the premature loss of the theater would result in a substantial windfall to Landlord and would preclude Tenant from recovering on its substantial investment of construction funds on the basis that the parties are only half way through the full possible duration of the lease.

Because there is more at stake here than simple possession (ie., ground lease, premature loss of construction improvements), this is not the type of case that is appropriate for summary eviction.  Landlord is directed to proceed via formal writ.  Moreover, additional issues to be

-1-

1  considered in a formal eviction trial may include whether the doctrine of "commercial

2  impracticability" applies in this case.  In Helms Constr. & Dev. Co. v. State, 97 Nev. 500 (1981),

3  the Supreme Court of Nevada stated the following:

4  
5  Alternatively, appellants contend that the common law doctrine of commercial
   impracticability or impossibility of performance should afford the same relief as
   the Uniform Commercial Code provision.  Although we recognize that the
6  statutory doctrine of commercial impracticability "[has] its roots in the common
   law doctrine of frustration or impossibility," appellants fail to demonstrate
7  commercial impracticability or impossibility under either the statutory or common
   law standards.
8  
9  In Nebaco, Inc. v. Riverview Realty Co., 87 Nev. 55, 57, 482 P.2d 305, 307
   (1971), we noted that performance would be excused if the promisor's
10  performance "is made impossible or highly impractical by the occurrence of
   unforeseen contingencies [citation], but if the unforeseen contingency is one
11  which the promisor should have foreseen, and for which he should have provided,
   this defense is unavailable to him." [Citations].
12  
13  The Arab oil embargo, although perhaps not within the contemplation of the
   parties, has been held by other courts to have been "reasonably foreseeable."
14  Furthermore, in order for an unforeseen cost increase to excuse performance, the
   increase "must be more than merely onerous or expensive, it must be positively
15  unjust to hold the parties bound."  In the instant case, Parson prays for a sum
   equivalent to .6 of one percent of its total contract and Helms prays for a sum
16  amounting to 2.7 of its bid.  Such costs overruns do not render performance of the
17  contract commercially impracticable.  (Emphasis added; some citations omitted)

18  
19  In the last couple of decades, the world has witnessed viral outbreaks including SARS,

   MERS, and Ebola.  These viruses did spread overseas and cases were diagnosed in the United
20  
21  States; however, through international and medical efforts, they were generally contained.  The

22  last instance of an uncontrolled, worldwide pandemic was the Spanish Flu in 1918-19.  Our world

23  has greatly changed since that time in medical ability to respond to similar threats, as

24  demonstrated in the global responses to SARS, MERS and Ebola, none of which resulted in

   worldwide shutdowns.
25  
26  There are questions of fact which this court believes are relevant to the instant case.  While

   the occurrence of a pandemic may be reasonably foreseeable, whether such would result in global
27  
28  "stay at home" orders may not have been reasonably foreseeable.  This court is not convinced that

   the various measures forced upon businesses were reasonably foreseeable.  National and statewide

1    measures, including the closing of non-essential businesses, such as Tenant's, for extended

2    periods of time, patron capacity limits and slow phased reopening throughout the pandemic, and

3    the halting of blockbuster movie releases by movie production companies are the types of things

4    that this court believes were not reasonably foreseeable, and which could render performance

5    impossible.  The current circumstances are the type which would make performance utterly

6    impossible.  The court feels Tenant is entitled to fully present facts regarding the impacts of the

7    COVID-19 pandemic in an attempt to demonstrate that performance has been made impossible by

8    the present circumstances.  The receiving and consideration of such facts (and the anticipated

9    contesting of such facts by Landlord) go beyond the parameters of summary judgment

10   proceedings.

11          The court further finds that the ground lease presents unusual facts which should not be

12   considered in a summary eviction venue.  While perhaps an oversimplified comparison, but not

13   without value in the case, the court recognizes the legislature has precluded summary eviction

14   where a landlord has leased a lot to the owner of a mobile home.  See, NRS 40.253(9).  These

15   cases essentially involve "ground" leases.  The legislature recognizes there is more at stake than

16   mere possession; as such cases involve aspects of tenant ownership of the structure.  Such cases

17   must move forward through the formal eviction process of NRS 40.290-420.  As this case

18   involves a ground lease with substantial improvements funded by the Tenant, this case is

19   analogous and possession should be sought through writ of restitution.

20          As the court finds that there are material facts that are most appropriately considered in a

21   formal eviction setting, the court provides no relief to either party under NRS 40.253(6).

22   Landlord may pursue the matter under NRS 40.290-420, or in a district court action where there is

23   sufficient jurisdictional limits to determine damages.

24

25   / / /

26

27   / / /

28

1        To be clear, so as to prevent conflicting orders or judgments, this court has not found

2   impossibility and/or frustration of purpose, but rather, finds that there are significant indicia of the

3   same.  The parties may litigate those issues in the selected venue.

4       **DATED** this _____ day of February, 2021.

5

6                                         **HEARING MASTER DAVID BROWN**

7                                         **LAS VEGAS JUSTICE COURT**

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Electronically Filed
3/11/2021 1:24 PM
Steven D. Grierson
CLERK OF THE COURT

1    **WAIV**
JEFFREY R. ALBREGTS, ESQ.

2    Nevada Bar No. 0066
jalbregts@albregtslaw.com

3    KRISTA N. ALBREGTS, ESQ.

4    Nevada Bar No. 13301
kalbregts@albregtslaw.com

5    JEFFREY R. ALBREGTS, LLC
701 Shadow Lane, Suite 150

6    Las Vegas, Nevada 89106
Telephone:  (702) 483-5026

7    Facsimile:  (702) 485-2343

8    *Attorneys for Plaintiff*

9                **EIGHTH JUDICIAL DISTRICT COURT**

10                    **CLARK COUNTY, NEVADA**

11

12   REGAL I, LLC, a Nevada limited liability          Case No.:   A-21-830229-C
     company, f/k/a PEBBLE COMMERCIAL

13   CENTER, LLC;                                       Dept. No.:  29

14                         Plaintiff(s),               **WAIVER OF SERVICE OF SUMMONS
                                                        AND COMPLAINT**
15          v.

16   EASTGATE THEATRE, INC., an Oregon
     corporation; DOE individuals I through X; and

17   ROE corporations and organizations I through
     V, inclusive,

18

19                         Defendants.

20

21          I, John Bragonje, counsel for Defendant EASTGATE THEATRE, INC. ("Eastgate"),

22   hereby acknowledge existence of the above action and hereby waive service of the Summons and

23   Complaint upon Eastgate.

24          I understand that I, or the entity I represent, will keep all defenses or objections to the

25   lawsuit, the court's jurisdiction, and the venue of the lawsuit, but that I waive any objections to

26   the absence of a summons or of service.

27

28

Waiver of Service of Summons and Complaint

I also understand that I, or the entity I represent, must file and serve an answer or a motion under Rule 12 of the Nevada Rules of Civil Procedure within 30 days from March 10, 2021, the date when this request was sent.

I declare under penalty of perjury under the law of the State of Nevada that the foregoing is true and correct.

Executed this 11th day of March, 2021.

**LEWIS ROCA ROTHGERBER CHRISTIE LLP**

 /s/  John Bragonje
JOHN BRAGONJE, ESQ.
Nevada Bar No. 9519
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada. 89169
*Counsel for Defendant Eastgate Theatre, Inc.*

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on the 11th day of March, 2021, the foregoing **Waiver of Service of Summons and Complaint,** was submitted for filing with the District Court Clerk of Clark County Nevada, to be served via the Court's ECF filing system on all parties of record.

_____
Krista N. Albregts, Esq.

**Heather Stroup**

| | |
|---|---|
| **From:** | Bragonje, John <JBragonje@lrrc.com> |
| **Sent:** | Thursday, March 11, 2021 12:51 PM |
| **To:** | Krista Albregts |
| **Cc:** | Jeff Albregts; Heather Stroup |
| **Subject:** | RE: Verified Complaint against Eastgate Theatre, Inc. |

Thanks.  You can affix my signature.

**John Bragonje**
Partner
702.474.2625 office
702.949.8398 fax
jbragonje@lrrc.com

**COVID-19 questions?**
**Connect to our Rapid Response Team**
**for answers and resources.**



Lewis Roca Rothgerber Christie LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
lrrc.com

**EXPERIENCE**
**A M P L I F I E D**

Because what matters
to you, matters to us.
*Read* our client service principles

---

**From:** Krista Albregts <kalbregts@albregtslaw.com>
**Sent:** Thursday, March 11, 2021 11:49 AM
**To:** Bragonje, John <JBragonje@lrrc.com>
**Cc:** Jeff Albregts <jalbregts@albregtslaw.com>; Heather Stroup <hstroup@albregtslaw.com>
**Subject:** Re: Verified Complaint against Eastgate Theatre, Inc.

**[EXTERNAL]**

Sure, we're ok with that.

**From:** Bragonje, John <JBragonje@lrrc.com>
**Date:** Thursday, March 11, 2021 at 9:19 AM
**To:** Krista Albregts <kalbregts@albregtslaw.com>
**Cc:** Jeff Albregts <jalbregts@albregtslaw.com>, Heather Stroup <hstroup@albregtslaw.com>
**Subject:** RE: Verified Complaint against Eastgate Theatre, Inc.

Thank you.  What do you think of my proposed changes that make it clear when the response is due and that I'm preserving all defenses?

**John Bragonje**
Partner
702.474.2625 office
702.949.8398 fax
jbragonje@lrrc.com

**COVID-19 questions?**
**Connect to our Rapid Response Team**
**for answers and resources.**

**Lewis Roca**
ROTHGERBER CHRISTIE

Lewis Roca Rothgerber Christie LLP
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169
lrrc.com

**EXPERIENCE**
**AM PLIFIED**

Because what matters
to you, matters to us.
*Read our client service principles*

**From:** Krista Albregts <kalbregts@albregtslaw.com>
**Sent:** Wednesday, March 10, 2021 2:42 PM
**To:** Bragonje, John <JBragonje@lrrc.com>
**Cc:** Jeff Albregts <jalbregts@albregtslaw.com>; Heather Stroup <hstroup@albregtslaw.com>
**Subject:** Re: Verified Complaint against Eastgate Theatre, Inc.

**[EXTERNAL]**

Hi John,

Thank you for taking the time to discuss this matter yesterday afternoon.  Please find attached the Waiver of Service of Summons and Complaint—if acceptable to you, please send us a signed copy back and we'll go ahead and get it filed.

Thanks again,

Krista

**From:** Bragonje, John <JBragonje@lrrc.com>
**Date:** Monday, March 1, 2021 at 7:23 PM
**To:** Jeff Albregts <jalbregts@albregtslaw.com>
**Cc:** Krista Albregts <kalbregts@albregtslaw.com>
**Subject:** RE: Verified Complaint against Eastgate Theatre, Inc.

Thanks, guys.  I will let you know concerning service.